Estella M. MILLER, Duane R. Miller, Tara Lynn Miller, a minor, by her Guardian ad Litem, Kenneth R. Baumgartner and Carl Robert Miller, a minor, by his Guardian ad Litem, Kenneth R. Baumgartner, Plaintiffs-Appellants-Cross Respondents,

v.

BRISTOL-MYERS COMPANY, a foreign corporation, Defendant-Respondent-Petitioner,

FIKE CORPORATION, a foreign corporation and Interstate, Inc., a Wisconsin corporation, Defendants-Co-Appellants,

BUKACEK CONSTRUCTION, INC., a Wisconsin corporation and General Casualty Company of Wisconsin, a Wisconsin insurance corporation, Defendants,

KAELBER COMPANY, a Wisconsin corporation and Sentry Insurance a mutual company, a Wisconsin corporation, Defendants-Co-Appellants,

ARCHITECTURAL ASSOCIATES, LTD. OF WISCONSIN, a Wisconsin corporation, Homestead Insurance Company, a Wisconsin insurance corporation, Scottsdale Insurance Company, a foreign insurance company and Columbia Casualty Company, a foreign insurance corporation, Defendants,

OEHCS, INC., a foreign corporation, Robert C. Brandys and Crum & Forster Insurance Companies, an insurance corporation, Defendants-Respondents-Cross Appellants,

Joseph R. KLEIN, The Klien Company, a Wisconsin corporation, Frank B. Hall & Company, a foreign

863

corporation and Factory Mutual Engineering Associates, Defendants.

Supreme Court

*No. 90-1612. Oral argument February 25, 1992.—Decided June 17, 1992.*

(Also reported in 485 N.W.2d 31.)

868

869

For the defendant-respondent-petitioner there were briefs by *James R. Clark, Kevin P. Whaley* and *Foley & Lardner,* Milwaukee and oral argument by *Mr. Clark.*

For the plaintiffs-appellants-cross respondents there was a brief by *Kenneth R. Baumgartner,* Kenosha and oral argument by *Kenneth R. Baumgartner.*

For the defendants-co-appellants there was a brief by *Robert F. Johnson, Laura E. Schuett* and *Cook & Franke, S.C.,* Milwaukee and *Robert E. Hankel* and *Paulson, Hankel, Bruner & Nichols, S.C.,* Racine and oral argument by *Mr. Johnson.*

DAY, J. This is a review of a published decision of the court of appeals,[1] which reversed and remanded a judgment of the Circuit Court for Racine County, Stephen A. Simanek, Judge, which granted summary judgment in favor of defendant, Bristol-Myers, against plaintiff, Estella Miller, and dismissed her suit for personal injuries.

This case raises the question of a parent corporation's tort liability for injuries sustained by its subsidiary's employee. There are two issues. First, whether the defendant parent corporation is immune from common law liability for such injuries under the Worker's Compensation Act?[2] Second, if the defendant parent corporation is not so immune, whether, as a matter of law, the defendant parent corporation acted in such a manner as to assume a common law duty of care to its subsidiary's employees?

The circuit court concluded that the defendant parent corporation was immune under the Worker's Compensation Act and therefore granted the defendant parent corporation's motion for summary judgment. The court of appeals concluded that the defendant parent corporation was not immune under the Worker's Compensation Act, reversed the circuit court's grant of summary judgment, and remanded the cause to the circuit court for a determination of whether the defendant parent corporation assumed a duty of care to its subsidiary's employees.

We hold that the defendant parent corporation is not immune under the Worker's Compensation Act. We further hold that, as a matter of law, the defendant parent corporation assumed a duty of care to the plaintiff

---

[1] *Miller v. Bristol-Myers Co.,* 161 Wis. 2d 683, 468 N.W.2d 744 (1991).

[2] Chapter 102, Stats., 1985–86.

employee. We therefore affirm the decision of the court of appeals to the extent that it reversed the circuit court's grant of summary judgment for the defendant parent corporation. We modify the decision of the court of appeals as follows: we remand the cause to the circuit court for a determination of whether the defendant parent corporation breached the duty it assumed by failing to exercise reasonable care in performing its undertakings with respect to that duty, and, if there was a breach, whether such breach was a cause of the employee's injuries under the standards set forth hereafter thereby becoming a third-party tortfeasor.

Defendant Bristol-Myers is the parent corporation and sole stockholder of the Medical Engineering Corporation (MEC) which employed plaintiff Estella Miller (Miller). On July 1, 1986, Miller was injured in a fire while working in MEC's newly constructed material preparation room. Miller was pouring toluene, a flammable chemical, into a disposal container when a static spark apparently caused the toluene to ignite resulting in the fire that injured Miller.

Miller asserts that through its actions, Bristol-Myers assumed a duty of care to MEC's employees and that such actions had a direct effect in causing the injuries sustained by Miller. Miller asserts that Bristol-Myers is not immune from liability under the Worker's Compensation Act. Bristol-Myers asserts that it did not assume a duty of care to MEC's employees. Bristol-Myers asserts that it is immune from liability pursuant to the "representative capacity" doctrine under the exclusive remedy provision of the Worker's Compensation Act.

The basic facts are as follows. Bristol-Myers and MEC are separate legal entities. Bristol-Myers manages and monitors MEC's performance through MEC's Board

of Directors which consists of the president of Bristol-Myers' health care group, the president of Zimmer, Inc. (a Bristol-Myers subsidiary), and the president of MEC.

Bristol-Myers' subsidiaries are required to submit Capitol Appropriation Requests before undertaking construction projects. Large capitol expenditures are approved by Bristol-Myers' General Finance Committee. Intermediate expenditures are reviewed and approved by the Bristol-Myers employees responsible for monitoring the particular subsidiary. Smaller expenditures may be approved by the subsidiary's management.

Bristol-Myers exercises "line authority" over its corporate subsidiaries. For example, MEC's president reports to the president of Zimmer, Inc., who was on MEC's Board of Directors and who in turn reports to the president of Bristol-Myers' health care group, who ultimately reports to Bristol-Myers' board of directors. In its response to Miller's interrogatories, Bristol-Myers stated: "As the sole stockholder of M.E.C., Bristol-Myers, like the sole stockholder of any corporation, had the 'power' (or legal ability) to influence the operation of M.E.C. Certainly, Bristol-Myers could have exercised its influence or 'power' over M.E.C. through those with 'line authority' over M.E.C., including the legal right or power to ultimately affect changes in safety-related matters or other day-to-day operations. However, in practice, the responsibility for the day-to-day operation of M.E.C., including as it pertained to safety matters, rested with the management of M.E.C."

Frank B. Hall Inc., is an insurance broker that, in addition to selling insurance, provides advisory services to its clients concerning loss control and safety. Bristol-Myers purchased insurance for itself and its subsidiaries from Frank B. Hall Inc.

In August, 1984, Rudy Acs, an assistant vice president of Frank B. Hall Inc., visited MEC and recommended that MEC construct a new material preparation room due to the large amounts of toluene used by MEC. Acs forwarded his recommendations to Alan Friedlander, a Safety and Loss Prevention Coordinator in Bristol-Myers' Insurance and Safety Department.

In his affidavit, Friedlander stated that he forwarded Acs' report to MEC, concurred therewith, and "I suggested that the room should be located along an outside wall, fully cut off from other operations by a fire wall. I also suggested that sprinklers, adequate ventilation, drainage, explosion resistant electrical equipment and multiple exits should be provided. It was suggested that the new Material Prep Room should be built as a part of a 1985 expansion which M.E.C. was planning." Friedlander stated that "Bristol-Myers did not, however, direct M.E.C. to necessarily include any particular features in the new Material Prep Room," and that his suggestions were based on his "very general knowledge of flammable liquid hazards and insurance requirements."

In June, 1985, Robert Graham, an evaluator in Bristol-Myers' Technical Evaluation Department, conducted an unannounced occupational health and safety audit of MEC. In his affidavit, Graham stated that he reported the results of his evaluation to the management of MEC and that, "[a]mong the observations I reported to M.E.C. were that fairly large quantities of toluene (a flammable liquid) were being used in the Material Prep Room. I also observed that the room did not have sprinkler protection or explosion proof electrical components."

Such observations appear on the document titled "Occupational Safety and Health Audit," under the "Priority I Observations" heading. A June 6, 1985 Bristol-Myers letter attaching the audit document states in

part: "The draft audit report, together with management comments, must be returned to [the Technical Evaluation Department] by July 6, 1985. If there are no additional comments, this should be so indicated by a statement to the effect that management substantially agrees with the observation and that appropriate action has been or will be initiated . . .. Please note that the management comments made on this draft audit report do not constitute a formal action plan. Such plan, which should incorporate the management comments, is to be prepared within 30 days from issuance of the final audit report."

With respect to that letter, the following colloquy took place during Graham's deposition:

Q. And when you fill out one of these audit reports and you have priority one observations, is it your understanding that the management of the facility has 30 days within which to return your report with either their comments or a statement saying that they don't have any comment?

A. (Graham) That's correct.

Q. And assuming that a particular facility does not have any comment, does not object in any way to your priority one findings, does this mean that Bristol-Myers now requires that company to start doing something about this priority one observation?

A. (Graham) Yes. It requires them doing something about the observation.

Following the Technical Evaluation Department's June, 1985 report, Robert Brandys, an independent safety consultant, was retained to provide advice to MEC concerning its material preparation room. The parties dispute who retained Brandys. Bristol-Myers

asserts that MEC retained Brandys upon the recommendation of Anthony Durso, a Corporate Director of Government Affairs and Product Assurance for Zimmer, Inc. MEC asserts that Bristol-Myers, through its "line authority," instructed Zimmer, Inc. to hire a safety consultant and that Zimmer, Inc. hired Brandys.

Though the record does not resolve whether Bristol-Myers instructed or otherwise compelled Zimmer, Inc. to hire Brandys, the record strongly suggests that Zimmer, Inc., not MEC, hired Brandys. In his deposition, Brandys affirmed that he believed that he was being hired by Zimmer, Inc. to perform some consulting services and that his invoices for services rendered in 1985 were sent to Durso. Moreover, a July 18, 1985 letter from Durso to R. Davis stated: "On July 16, 1985, Robert Brandys (Zimmer safety consultant) and I visited MEC to assess the facility with regard to: (1) the handling of solvents in the material preparation area, (2) the storage area for bulk solvents, and (3) the methods employed to dispose of hazardous solvent waste." The reference to Brandys as a "(Zimmer safety consultant)," clearly implies that Zimmer, Inc., not MEC, hired Brandys.

Notwithstanding whether Bristol-Myers instructed or otherwise compelled Zimmer, Inc. to hire Brandys, it is apparent that Brandys visited MEC with Durso and made both a preliminary and final draft report of the safety conditions at MEC. In his deposition, Brandys stated that he toured the MEC plant and then had a "wrap-up" meeting with Durso and a few others. Brandys stated that they discussed proper "gowning" of employees and bonding and grounding techniques but that Durso informed the others that Brandys would be preparing a report relative to his findings of the necessity of a sprinkler system.

Nevertheless, Brandys stated that he included many items other than MEC's sprinkler system in his draft report and that he "recommended to Tony Durso while we were driving back that the facility was in such serious shape that the report should be expanded to include other areas." Brandys stated that Durso's initial response was "no," but that Durso subsequently agreed that if Brandys could show that it was required by guidelines such as OSHA (Occupational Safety and Health Administration), NFPA (National Fire Protection Association), or Factory Mutual (an insurance company), then it could be included in the report.

Brandys stated that he received some phone calls from Durso after Durso reviewed the draft report and that Durso told him that "the report went too far, it had too many recommendations and I was recommending a Cadillac rather than a Chevy." Brandys stated that he modified the report's recommendation for conductive static mats relying upon additional information provided to him by Durso concerning the floor's Epoxy coating.

Brandys affirmed that he discussed and recommended the use of low particulate cotton gowns or nomex gowns in lieu of the nylon gowns being used by employees at the time because of static buildup and because nylon is flammable. Brandys stated that Durso told him, "It's an FDA item. We are not going to discuss it."

In August, 1985, MEC submitted a Capitol Appropriation Request seeking authorization to spend approximately $142,000 to construct the new material preparation room. This was reviewed by a financial analyst on Bristol-Myers' staff and approved by the Bristol-Myers Group President responsible for Bristol-Myers' health care group and one of the directors of MEC. Subsequently, a second Capitol Appropriation Request was

submitted and approved. Construction of the new material preparation room began in late 1985.

Bristol-Myers asserts that although it concurred in the recommendation and decision to build the new material preparation room, it did not require that the new material preparation room contain a halon fire suppression system or any other fire extinguishing system. Bristol-Myers alleges that it did not review the plans or specifications for the new material preparation room and that its role was limited to reviewing and approving the Capitol Appropriation Requests and to providing MEC with general information concerning safety and insurance requirements.

Among other things, Miller contends that Bristol-Myers exerted its power and involved itself with the day to day operations of MEC and, in so doing, committed independent acts of negligence directly affecting the conditions causing the static spark, the fire, and Miller's resulting injuries. Miller argues that the failure to follow Brandys' original recommendations resulted in Miller's continued use of a nylon gown which ignited during the fire causing her injuries and that changing Brandys' original recommendations resulted in the lack of static grounding mats or bonding wires which would have prevented the accident in the first place.

We first address the Worker's Compensation Act issue. The Worker's Compensation Act grants immunity from common law liability to an "employer" under sec. 102.03(2), Stats., the "exclusive remedy" provision of the Act.[3] However, the Act allows suits to be brought by

---

[3] **102.03 Conditions of liability. . . . (2)** Where such conditions exist the right to the recovery of compensation under this chapter shall be the exclusive remedy against the employer, any other employe of the same employer and the worker's compensation insurance carrier. This section does not limit the right of an employe to bring action against any coemploye for an assault

injured employees against non-employer third parties.[4]

Bristol-Myers argues it is immune from Miller's suit under the exclusive remedy provision. Conceding that it is a separate and distinct corporate entity from MEC, Bristol-Myers does not assert itself to be Miller's employer.[5] Rather, Bristol-Myers argues that it is immune from liability under the Worker's Compensation Act pursuant to Wisconsin's representative capacity doctrine. Miller argues that the representative capacity doctrine is inapplicable to Bristol-Myers and that her suit is allowed against Bristol-Myers as a third party action. The court of appeals concluded that the representative capacity doctrine was inapplicable to Bristol-Myers. We agree with the court of appeals.

The representative capacity doctrine provides immunity to those who act in their capacity as a representative for the employer from third party suits. *See Kruse v. Schieve*, 61 Wis. 2d 421, 213 N.W.2d 64 (1973) (immunity of a corporate vice-president); *Ortman v. Jensen & Johnson, Inc.*, 66 Wis. 2d 508, 225 N.W.2d 635

intended to cause bodily harm, or against a coemploye for negligent operation of a motor vehicle not owned or leased by the employer, or against a coemploye of the same employer to the extent that there would be liability of a governmental unit to pay judgments against employes under a collective bargaining agreement or a local ordinance.

[4] **102.29 Third party liability. (1)** The making of a claim for compensation against an employer or compensation insurer for the injury or death of an employe shall not affect the right of the employe, the employe's personal representative, or other person entitled to bring action, to make claim or maintain an action in tort against any other party for such injury or death, hereinafter referred to as a 3rd party . . ..

[5]We therefore do not reach the issue of whether a parent corporation can be an "employer" of its subsidiary's employee for the purpose of the Worker's Compensation Act.

(1975) (immunity of an officer and director of a company); *Laffin v. Chemical Supply Co.,* 77 Wis. 2d 353, 253 N.W.2d 51 (1977) (immunity of the president and a superintendent of a company); *Gerger v. Campbell,* 98 Wis. 2d 282, 297 N.W.2d 183 (1980) (immunity of the president of a corporation). The immunity is not available, however, where one acts outside of his or her representative capacity. *See id.* at 288-89.

As noted by the court of appeals in this case, the basis for granting immunity under this doctrine is that the person is granted immunity from suits by employees because such person owes a duty to the employer, not the employee. *See id.* This makes sense, for, if one owes no duty to the employee then no breach of duty can occur and no action for tort liability may lie. Therefore, in order for the representative capacity doctrine to apply, the person or entity claiming immunity must owe a duty to the employer and have acted pursuant to that duty.

As found by the court of appeals in this case, Bristol-Myers, as the sole shareholder of MEC, had no duty to manage or supervise the operations of MEC. Wisconsin clearly gives the power to manage a corporation to the board of directors, not the shareholders. Section 180.0801(2), Stats., 1989-90, of the Wisconsin business corporation law, states: "All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, its board of directors, subject to any limitation set forth in the articles of incorporation." At the time of Miller's injuries, sec. 180.30, Stats., 1985-86, stated in part, "The business and affairs of a corporation shall be managed by a board of directors except as may be otherwise provided in the articles of incorporation." The Revision Committee Note (1971), stated, "Traditionally,

the management of a corporation has in legal theory been vested in the board of directors." Such corporate practice appears to be the norm. *See* 5 FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS Sec. 2097 (Perm. ed. 1987).

We decline to expand immunity under the representative capacity doctrine to those persons or entities that owe no duty to the employer. We therefore conclude that Bristol-Myers is not immune from Miller's suit under the representative capacity doctrine. Bristol-Myers does not stand in the shoes of an employer, and, if found negligent on remand, may be liable as a third party tortfeasor.

We next address the assumption of duty issue. Bristol-Myers argues that it is immune from Miller's suit under the common law rule that a parent corporation owes no duty to the employees of its subsidiary unless the parent assumed such a duty. Bristol-Myers argues that, as a matter of law, it did not assume a duty to Miller and therefore summary judgment was properly granted against Miller.

*Muniz v. National Can Corp.*, 737 F.2d 145 (1st Cir. 1984), outlined the law surrounding a parent corporation's common law duty to its subsidiary's employees. The court stated:

> An employer has a nondelegable duty to provide for the safety of its employees in the work environment. The parent shareholder is not responsible for the working conditions of its subsidiary's employees merely on the basis of parent-subsidiary relationship. A parent corporation may be liable for unsafe conditions at a subsidiary only if it assumes a duty to act by affirmatively undertaking to provide a safe working environment at the subsidiary.

881

Such an undertaking may be express, as by contract between the parent and the subsidiary, or it may be implicit in the conduct of the parent. . . .

Because an employer has a nondelegable duty to provide safe working conditions for its employees, we do not lightly assume that a parent corporation has agreed to accept this responsibility. Neither mere concern with nor minimal contact about safety matters creates a duty to ensure a safe working environment for the employees of a subsidiary corporation. To establish such a duty, the subsidiary's employee must show some proof of a positive undertaking by the parent corporation.

*Id.* at 148 (citations and notes omitted).[6]

■

Wisconsin recognizes that a party, by its actions, may assume a duty of care to another where such duty did not previously exist under the "good samaritan" rule expressed in the Restatement (Second) Torts (1965),[7]

---

[6]*See Love v. Flour Mills of America,* 647 F.2d 1058, 1063 (10th Cir. 1981). *See also Heinrich v. Goodyear Tire & Rubber Co.,* 532 F. Supp. 1348, 1354-56 (D.Md. 1982); *Rick v. RLC Corp.,* 535 F. Supp. 39, 42-43 (E.D. Mich. 1981); Robert S. Treece and Evan M. Zuckerman, *A Parent Corporation's Liability for the Torts of its Subsidiary in the Context of the Exclusive Remedy Provision of the Worker's Compensation Laws,* 50 Ins. Counsel J. 609, 613-15 (1983).

[7]RESTATEMENT (SECOND) OF TORTS Sec. 324A (1965).

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

approved of in *American M.L. Ins. Co. v. St. P. F. & M. Ins. Co.*, 48 Wis. 2d 305, 313, 179 N.W.2d 864 (1970). Wisconsin courts, including the court of appeals in this case, have not defined the extent of a parent corporation's undertaking necessary for it to have assumed a duty of care to its subsidiary's employees.

■ We begin by examining section 324A in its entirety. Section 324A establishes when an assumption of duty arises and the grounds for liability thereunder. The introductory portion establishes when an assumption of duty arises. The elements for an assumption of duty to arise are that the actor must: (1) undertake to render services, (2) to another, (3) which such actor should recognize as necessary for the protection of a third person.

Bristol-Myers relies in part on *Rick v. RLC Corp.*, 535 F. Supp. 39 (E.D. Mich. 1981), for the proposition that, for an assumption of duty to arise, the parent corporation must not have acted intending primarily to benefit itself. With respect to section 324A's introductory portion, which requires the parent corporation to have undertaken to "render services" to the subsidiary, *Rick* concluded that the employee must:

> produce evidence that [the parent corporation] undertook to provide the services under an agreement or with the intention of benefitting [the subsidiary] or its employees. Evidence that benefits were

---

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The use of the word "protect" in the introductory portion apparently was a typographical error published in the Restatement and should read "perform." *Hill v. United States Fidelity and Guaranty Company*, 428 F.2d 112, 115 n.5 (5th Cir. 1970), *cert. denied*, 400 U.S. 1008 (1971).

conferred upon [the subsidiary] or its employees is not sufficient to establish a duty if [the parent corporation's] conduct was consistent with an intention primarily to serve its own purposes.

*Rick,* 535 F. Supp. at 45 (notes omitted).

Contrary to *Rick*'s analysis, we find nothing to support the position that, where the parent corporation's undertaking is intended primarily for its own benefit, an assumption of duty cannot arise. For a duty to arise, section 324A requires an undertaking to render services *"to another"* it does not require such undertaking be intended primarily for the benefit of one or another. In the context of a parent-subsidiary relationship, it would invariably be primarily in the interest of the parent to undertake to render services for the subsidiary because the fortunes of the parent are inextricably linked with the fortunes of the subsidiary. To infer a primary benefit element in the parent corporation context would be to effectively extinguish the liability provided for in section 324A.

The question is not whether the parent corporation intended to primarily benefit itself, rather, the question is whether the parent rendered a service to the subsidiary. Unlike *Rick,* we read "render services to another" to mean just what it says, namely, did the parent corporation provide some service to the subsidiary?

Once an assumption of duty is shown under the introductory portion of section 324A, the remaining portion of the introduction and subsections (a), (b), and (c), establish when liability for assuming such a duty arises. Liability for the actor arises if the actor failed to exercise reasonable care in the undertaking *and* the requirements of subsections (a), (b), or (c) are met.

Under subsection (a), liability arises where the actor's failure to exercise reasonable care in the undertaking increases the risk of harm to the third person. If a parent corporation unreasonably undertook activities and such activities increased the risk of harm to its subsidiary's employees, and such increase was a cause of the employee's injuries, then the parent corporation would be liable under section 324A(a). However, if it can be shown that the parent corporation exercised reasonable care in undertaking its activities, or the activities did not increase the risk of harm, or the increased risk was not a cause of the employee's injuries, then the parent corporation cannot be held liable under section 324A(a).

Under subsection (b), the actor must have undertaken to perform the other's duty to the third person. Bristol-Myers relies in part on *Heinrich v. Goodyear Tire and Rubber Co.*, 532 F. Supp. 1348 (D. Md. 1982), for the proposition that the parent corporation is liable only where its actions were meant to supplant rather than supplement the subsidiary's duty of care to its employees. *Heinrich* involved an employee's occupational disease claim against the subsidiary's parent corporation. The court stated:

> Liability under section 324A(b) arises in the workplace setting only if the actor's undertaking was intended to be in lieu of, rather than as a supplement to, the employer's own duty of care to the employees.

*Id.* at 1355 (citations omitted).

We do not adopt the supplant-supplement standard because it focuses on the extent of the parent corporation's activity rather than on whether such activity was

a cause of the injuries. The issue is not how much the parent corporation did, but rather, whether what it did was a cause of the injuries. It would be inequitable to provide immunity to a parent corporation that had assumed a duty of care to its subsidiary's employees and whose unreasonable performance of its undertaking was a cause of the injuries, simply because its activities were supplemental to, rather than in lieu of, the subsidiary's practices. A parent corporation that assumes a duty to its subsidiary's employees should be held to a standard of reasonable care even if its actions were only supplemental to the subsidiary's practices.

Under subsection (c), the harm suffered must be due to reliance upon the actor's undertaking by the other or the third person. In *Davis v. Liberty Mut. Ins. Co.,* 525 F.2d 1204 (5th Cir. 1976), the court rejected the plaintiff's 324A(c) reliance argument finding "no evidence that [the employer] relied on [the insurance company's] inspections that it neglected its own safety program." *Davis,* 525 F.2d at 1208. In *Heinrich,* the court stated:

> Similarly, liability may be imposed under section 324A(c), if, for example, [the subsidiary] relied upon [the parent corporation's] information and services such that [the subsidiary] lessened, or omitted taking, its own safety measures regarding the chemicals as to which information was supplied by [the parent corporation].

*Heinrich,* 532 F. Supp. at 1356.

██

We agree with rationale of *Davis* and *Heinrich* to the extent that the subsidiary or the employee must have relied on the parent corporation's undertaking and that, because of that reliance, they lessened, omitted, neglected, or otherwise altered their own safety practices

and such alteration was a cause of the employee's injuries.

Thus, we conclude that a parent corporation assumes a duty of care to the employees of its subsidiary where it is found that the parent corporation (1) undertook to render services, (2) to the subsidiary, (3) which the parent corporation should have recognized was necessary for the protection of the subsidiary's employees. We conclude that the parent corporation is liable to its subsidiary's employee if the parent corporation failed to exercise reasonable care to perform its undertaking *and,* (a) the parent corporation's failure to exercise reasonable care increased the risk of harm to the employee and such increase was a cause of the employee's injuries, (b) the parent corporation failed to exercise reasonable care in performing the assumed duty and such unreasonable performance was a cause of the employee's injuries, or (c) the subsidiary or the employee relied upon the parent corporation's undertaking such that they lessened, omitted, neglected, or otherwise altered their safety related practices and such alteration was a cause of the employee's injuries.

In reviewing a trial court's grant of summary judgment, this court must apply the standard set forth in sec. 802.08(2), Stats., 1989–90. *Dziewa v. Vossler,* 149 Wis. 2d 74, 77, 438 N.W.2d 565 (1989). Section 802.08(2), Stats., provides in part:

> The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Bristol-Myers claims that, under the undisputed facts, it did not assume a duty to MEC. We disagree. We conclude that Bristol-Myers did assume a duty to insure the existence of a safe material preparation room for MEC's employees.

For an assumption of duty to arise, it need be shown that Bristol-Myers rendered a service to MEC beyond which Bristol-Myers, as a shareholder, had no duty to provide, and which Bristol-Myers should have recognized as necessary for the protection of MEC's employees. That Bristol-Myers rendered services beyond its duty as a shareholder is manifest.

After Acs' August, 1984 report recommending that MEC build a new material preparation room due the large amounts of toluene used at MEC, Friedlander, a Bristol-Myers Safety and Loss Coordinator, not only forwarded the report to MEC, but concurred therewith and offered the additional recommendations regarding sprinklers, adequate ventilation, drainage, explosion resistant electrical equipment and multiple exits. Friedlander's statements that Bristol-Myers did not direct MEC to necessarily include any particular features in the new material preparation room and that his suggestions were based on his very general knowledge of flammable liquid hazards and insurance requirements, do not persuade us that his actions played no role in rendering safety advice to MEC. Friedlander's service of advice cannot be characterized as minimal simply because Bristol-Myers allegedly never directed that the new material preparation room contain particular features. Moreover, the quality of the advice goes to whether the parent corporation failed to exercise reasonable care in providing its service, not to whether a service was provided.

With respect to Bristol-Myers' unannounced June, 1985 Technical Evaluation Department evaluation of

MEC, Graham, an evaluator in the Technical Evaluation Department, stated in his affidavit that he reported to MEC the observations that fairly large amounts of toluene were used in the material preparation room, and that the room did not have sprinkler protection or explosion proof electrical components.

These observations were listed as Priority I Observations in the audit document. Both the cover letter to the audit document and Graham's statements in his deposition confirming that Bristol-Myers requires that the audited facility do something about the observation clearly evidence a significant level of Bristol-Myers involvement with the new material preparation room at MEC.

Like Friedlander's involvement, Bristol-Myers' audit of MEC cannot be characterized as too minimal to be characterized as rendering a service to MEC. Moreover, the documented and acknowledged requirement that the facility audited must respond to the audit in certain circumstances, strongly suggests a significant level of control which Bristol-Myers in practice exercised over the audited facilities.

It is beyond question that Bristol-Myers should have known that its undertakings with respect to the new material preparation room were necessary for the protection of MEC's employees.

■■■

Therefore, given the degree of Bristol-Myers' involvement with MEC's material preparation room, as evidenced by the services rendered to MEC by Bristol-Myers through Friedlander and the Technical Evaluation Department, and that Bristol-Myers should have known that such involvement was necessary for the protection of MEC's employees, we conclude, as a matter of law, that Bristol-Myers assumed a duty to insure the

existence of a safe material preparation room at MEC for MEC employees.

Lastly, the issues surrounding Bristol-Myers' and Zimmer, Inc.'s roles in influencing Brandys to alter his report are questions of fact. Specifically, whether and to what extent Bristol-Myers, through "line authority" or other means, undertook to influence the contents of Brandys' reports, whether and to what extent Brandys altered his reports due to Bristol-Myers' influence, and whether and to what extent such alterations were a cause of Miller's injuries, are questions for the finder of fact.

Therefore, the question on remand is whether Bristol-Myers failed to exercise reasonable care to perform its undertakings with respect to insuring a safe material preparation room at MEC for MEC employees and (a) whether Bristol-Myers' failure to exercise reasonable care increased the risk of harm to Miller and such increase was a cause of Miller's injuries, or (b) whether Bristol-Myers' failure to exercise reasonable care in performing the assumed duty was a cause of Miller's injuries, or (c) whether MEC or Miller relied upon Bristol-Myers' undertakings such that they lessened, omitted, neglected, or otherwise altered their safety related practices and such alteration was a cause of Miller's injuries.

In conclusion, we hold that Bristol-Myers is not immune under the Worker's Compensation Act. We further hold that, as a matter of law, Bristol-Myers assumed a duty to insure the existence of a safe material preparation room at MEC for MEC's employees. We therefore affirm the decision of the court of appeals to the extent that it reversed the circuit court's grant of summary judgment for Bristol-Myers. We modify the

decision of the court of appeals as follows: we remand the cause to the circuit court for a determination of whether Bristol-Myers breached the duty it assumed by failing to exercise reasonable care in performing its undertakings with respect to insuring the existence of a safe material preparation room at MEC, and, if there was a breach, whether such breach was a cause of Estella Miller's injuries under the standards set forth herein.

*By the Court.*—The decision of the court of appeals is modified, and as modified, affirmed and remanded for further proceedings not inconsistent with this opinion.