**Mary HAMMANN, as Personal Representative for the Estate of Bradley Hammann, Plaintiff–Appellant,**

**v.**

**UNITED STATES of America and Barron County, Wisconsin, Defendants–Appellees.**

No. 93–1361.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1993.

Decided May 19, 1994.

---

Joel W. Brodd (argued), and Paul R. Dahlberg, Doar, Drill & Skow, Baldwin, WI, for plaintiff-appellant.

Richard D. Humphrey, Asst. U.S. Atty. (argued), Office of the U.S. Atty., and Raymond G. Clausen (argued), Stilp & Wells, Madison, WI, for defendants-appellees.

Before CUMMINGS and ROVNER, Circuit Judges, and GRANT, District Judge.*

ILANA DIAMOND ROVNER, Circuit Judge.

This case arises from the tragic death of Bradley Hammann on his family's dairy farm in Western Wisconsin. Mr. Hammann was asphyxiated when he ventured into a manure reception pit looking for his missing three year old daughter, who he apparently thought might have wandered into the pit. His widow, Mary Hammann–Stauner, brought this wrongful death action against the United States and Barron County, Wisconsin, contending that the defendants had negligently failed to ensure that the reception pit was constructed with an appropriate cover and to apprise Mr. Hammann of the dangers attending an uncovered pit. The district court granted summary judgment in favor of the defendants. Because we agree with the district court that the defendants assumed no duty to supervise the design or construction of the reception pit, we affirm.

## I. FACTS

In 1984, Mr. Hammann sought out the advice and assistance of the U.S. Soil Conservation Service ("SCS") and Barron County Land Conservation Department (the "County") in constructing a waste transfer and storage system, which would facilitate the

---

* The Honorable Robert A. Grant, of the Northern District of Indiana, sitting by designation.

storage of manure for use in crop fertilization. The system eventually constructed on the Hammann farm consisted of three principal components: (1) a reception pit (also known as a gravity drop structure) into which the manure would be deposited initially; (2) a transfer pipe to conduct the manure from the reception pit to a storage pond; and (3) the storage pond, where the manure would remain until withdrawn for fertilization. Installation of the system was completed in July 1984.

In SCS terminology, the reception pit and transfer pipe comprise the "transfer practice," whereas the storage pond constitutes the "storage practice." Each practice is governed by separate specifications. SCS Specification 358 "establishes the minimum acceptable requirements for design, construction and operation of waste transfer components." A. 14. In pertinent part, that specification provides:

(1) "The design shall consider the safety of humans and animals during construction and operation." A. 15.

(2) "A cover that will support the anticipated live and dead loads and provide safety for animals and/or humans shall be provided for the drop structure. Permanent barriers such as gates, fences, etc., may be installed in lieu of a cover if such barriers insure adequate safety for human and animal traffic." A. 15.

(3) "The protective cover or barrier for the hopper or drop structure inlet shall be maintained to provide safety for animal and human traffic. The cover or barrier shall be replaced immediately after each cleaning." A. 19.

(4) "This practice shall not be installed until the overall waste management system has been planned and the essential components determined." A. 14.

The minimum requirements for the design, construction and operation of waste storage ponds, on the other hand, are set forth in SCS Specification 425, which provides:

(1) "This practice applies where [inter alia,] ... [a]n overall waste management system has been planned...." A. 21.

(2) "This practice shall not be installed until the necessary components for a waste management system have been determined." A. 21.

Under the supervision of SCS District Conservationist Eugene Hausner, Soil Conservation Technician Leonard Splett surveyed the site for the Hammanns' storage pond and drew up plans for the pond. Splett's design for the pond included a drawing depicting, inter alia, the location of the transfer pipe and indicating the diameters of the two different types of pipe (PVC or concrete) that might be used. A. 10. According to Splett's deposition testimony, however, this was the limit of his efforts to implement the requirements of Specification 358:

Q. So you used Standard 358 to specify the type of pipe that should be used at Brad Hammann's farm, didn't you?

A. Yes.

Q. So you took portions of Standard 358 and used them as the design of his system, correct?

A. Yes.

Q. And other portions of 358, particularly the design of the pit, you didn't do anything with that?

A. No.

R. 62 at 55. Splett did provide limited advice to Mr. Hammann concerning the ramifications of locating the reception pit in various places.

Q. Did you tell them if you're going to put it at the south end of the barn you're going to have to have a pump?

A. Yes.

Q. Did you tell him that?

A. I imagine I did, yeah.

Q. He wouldn't know that, would he?

A. No. Because of the elevation you have to have a lift here, it wouldn't flow by gravity there (indicating).

Q. Mr. Hammann was relying upon you as the design engineer for the system, wasn't he?

A. Yes.

Id. at 34. Splett also acknowledged that he had counselled Mr. Hammann "about the

pros and cons of a gravity system." *Id.* at 43.

Splett did not, however, design or install the reception pit. Just who did is uncertain. Lester Molde, an employee of the County, verified the mathematical calculations contained in Splett's plans, surveyed the site for the pond, and, after the pond was excavated, verified that the work had been completed according to Splett's specifications. Molde also signed off on the design on behalf of the County. Klein Construction, Inc. ("Klein") completed the excavation for the project. Allen Klein, the company owner, thought that Mr. Hammann and his employees had purchased the materials for both the reception pit and transfer pipe and installed them with the help of the Klein backhoe operator who excavated the area. R. 53 at 80–81. The backhoe operator has not been located by the parties.

The events leading to Mr. Hammann's death took place on July 16, 1989. He and his wife were milking cows inside their barn when they noticed that their three year old daughter had wandered from their sight. The couple parted to search for her. Mrs. Hammann eventually found her daughter outside. When she returned to the barn, her husband was gone. She noticed that the door to a shed atop the reception pit was open.[1] When she climbed up to the shed and looked down into the uncovered pit, she saw her husband's cap floating in the manure below. Help was summoned, and eventually Mr. Hammann's body was discovered submerged in the waist-deep manure. The coroner's report attributed his death to asphyxiation by methane fumes.

## II. ANALYSIS

Ms. Hammann–Stauner asserts that SCS and Barron County were negligent in failing to apprise Mr. Hammann of the need for a cover over the reception pit or otherwise ensuring that such a cover was installed.[2] Had the pit been covered, the plaintiff reasons, it would have been impossible for anyone to fall into the pit and thus her husband would not have ventured into the pit for fear that their daughter had fallen in.[3] Under Wisconsin law, which the parties agree governs, she must establish four elements to prevail on her negligence claim: (1) a duty of care on the part of the defendants; (2) a breach of that duty; (3) a causal connection between the breach and the injury to Mr. Hammann; and (4) an actual loss or damages resulting from the injury. *Losinski v. County of Trempealeau*, 946 F.2d 544, 552 (7th Cir.1991); *Misany v. United States*, 873 F.2d 160, 162 (7th Cir.1989). Neither SCS nor the County disputes that to the extent they undertook to assist or approve the construction of some portion of the waste man-

1. The shed itself may have partially complied with Specification 358's requirement of a protective barrier, although one witness indicated that even if the shed restricted access to the pit, the specification would still require a grate over the opening to prevent anyone from falling in. *See* R. 50 at 48–56.

2. In addition to the negligence claim, Ms. Hammann–Stauner asserted a strict liability claim against the United States, contending that the SCS had in effect supplied the Hammanns with a manure reception pit that was defective. R. 2 at 4–5. SCS contended below that the limited waiver of sovereign immunity contained in the Federal Tort Claims Act, 28 U.S.C. § 1346(b), does not permit strict liability claims against the United States. R. 40 at 4, citing *Laird v. Nelms*, 406 U.S. 797, 803, 92 S.Ct. 1899, 1902–03, 32 L.Ed.2d 499 (1972); *Dalehite v. United States*, 346 U.S. 15, 44–45, 73 S.Ct. 956, 972–73, 97 L.Ed. 1427 (1953); and *Wright v. United States*, 404 F.2d 244, 246 (7th Cir.1968). The district court concluded that because SCS had not man-

ufactured or supplied the reception pit, there was no basis to assert a strict liability claim against the government in any event. R. 73 at 7. We need not address the viability of this claim, as Ms. Hammann–Stauner has not pursued it on appeal.

3. Quite clearly, there is a significant causation question raised by the plaintiff's theory, given that it rests not on the supposition that Mr. Hammann himself fell into the pit, but rather on the notion that he would not have climbed down into the pit but for his presumed fear that his daughter had fallen in. Although the United States stipulated for purposes of summary judgment that the absence of a cover led to Mr. Hammann's death (R. 64 at 10 ¶ 11), Barron County did not, contending that Mr. Hammann's reasons for entering the pit were not truly known (R. 66 at 2 ¶ 11). In any event, because we conclude that the defendants breached no duty of care with respect to the design or construction of the reception pit, we need not consider this issue.

agement system, they were obligated to act with a reasonable degree of care. *See Miller v. Bristol–Myers Co.*, 168 Wis.2d 863, 485 N.W.2d 31, 39–41 (1992). Nor do they deny that the reception pit fell short of industry standards (as reflected in Specification 358, for example) for its lack of a cover or comparable barrier. The heart of their defense is that they assumed no duty to monitor the design and construction of the reception pit, and thus had no obligation to ensure compliance with Specification 358's cover requirement or to apprise Mr. Hammann of its import.

Ms. Hammann–Stauner relies on the following to establish a duty on the part of the defendants:

(1) SCS and the County had superior knowledge concerning the importance of a cover for the reception pit;

(2) Mr. Hammann, according to the plaintiff, relied on the defendants for the design and construction of the entire waste management system and the defendants were aware of that reliance;

(3) Specification 425 required that all components of the system be determined before the storage practice was installed;

(4) SCS addressed the transfer practice to some extent by specifying the type of transfer pipe to be used as well as its location;

(5) SCS had some discussions with Mr. Hammann concerning the type of reception pit to be used and its location;

(6) The plan for the pond prepared by SCS and approved by the County suggested that components of the transfer practice would comply with Specification 358.

In essence, Ms. Hammann–Stauner argues that although the defendants may not actually have designed or installed the reception pit, by undertaking to design and approve the storage pond, they embarked on a course of conduct that obligated them to ensure that *all* components of the system were appropriately designed and constructed. We find the record inadequate to support that contention, however.

There is no evidence before us reasonably suggesting that the defendants agreed to design the reception pit or gave Mr. Hammann the impression that they would do so. Employees of both the SCS and the County represented unequivocally that the defendants had nothing to do with the design or construction of the pit. R. 36 ¶ 3; R. 37 ¶ 2; R. 41 ¶ 4; R. 50 at 25, 27, 42; R. 51 at 11–12, 16, 24, 25–26; R. 52 at 30–31, 42–43, 50, 67–68; R. 62 at 29, 31, 32, 36–38, 46, 48, 51, 53, 55, 73–80, 84, 87, 91; R. 63 at 13–14. Indeed, SCS employees made clear that they had no authority to design anything but the storage pond. R. 50 at 15–16; R. 62 at 37–38, 73–77; R. 51 at 11–12, 15, 19–20, 25–26, 28, 46, 55; *see also* R. 63 at 24–25. Employees of the County, on the other hand, indicated that they had no authority to design *any* aspect of the system. Their role was limited to verifying the SCS' arithmetical computations, surveying the pond, supervising its construction, seeding the area for purposes of water conservation, and verifying that the pond was built in accordance with the design. R. 52 at 28–32, 34–35, 37, 41, 42–43, 47–53, 58–59, 62–63, 65–66, 69–70; R. 63 at 10–20, 40–41. Design and installation of the transfer practice, including the reception pit, was a matter left to Mr. Hammann and any suppliers, architects, or engineers with whom he might choose to consult. R. 50 at 39; R. 62 at 75–77. Thus, although the plaintiff would have us recast the defendants' limited role into that of a supervisory architect or engineer with a commensurate degree of responsibility to oversee all aspects of the construction at the Hammann farm, we discern nothing in the record to support the notion that the defendants actually assumed such a role. *Compare Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 859 F.2d 242, 248 (2d Cir.1988) (subcontractors with "discrete, circumscribed roles in the overall construction project" did not owe duty of care to other subcontractors), *with Caldwell v. Bechtel, Inc.*, 631 F.2d 989, 1001–02 (D.C.Cir.1980) (firm retained to oversee safety concerns for construction project owed duty of care to all workers who were foreseeable victims of hazardous conditions at work site).

As Ms. Hammann–Stauner reminds us, Splett did acknowledge at one point that Mr.

Hammann had relied on him as the design engineer for the waste management "system." R. 62 at 34. Dale Hanson, a County employee, similarly agreed that Mr. Hammann was relying on the expertise of SCS to design the "system" properly. R. 63 at 33–34. But read in context with the repeated and unequivocal disavowals of any involvement with the design or construction of the transfer practice, we do not believe that these statements can reasonably be read to suggest that the defendants somehow assumed responsibility for the reception pit or led Mr. Hammann to believe that they had. On the contrary, Eugene Hausner testified that it was routine practice in his office to apprise landowners that the SCS did not have the expertise or authority to design the transfer components of the system (although he did not know whether Mr. Hammann was so informed). R. 51 at 19–22, 32–33, 40–41.

Ms. Hammann–Stauner nonetheless avers that "[i]t was my understanding and remains my understanding that the entire manure system was designed and approved by SCS," that her husband "went to SCS and Barron County for their assistance and expertise in designing, constructing and approving our manure system," and that "[w]e relied on SCS's expertise for the design, construction and approval of the entire manure system." R. 68 ¶¶ 3–5. However, her own affidavit indicates that she was not directly involved in the design or construction of the system. *Id.* ¶ 2. Indeed, she acknowledged below that the only two individuals other than the defendants with personal knowledge of this subject—Mr. Hammann and his father—are both deceased. R. 43 at 2 n. 1. Her own lack of first-hand knowledge of what impression the defendants may have given to Mr. Hammann as to the scope of their undertaking renders Ms. Hammann–Stauner unqualified to assess the extent to which her late husband reasonably relied on them for advice concerning the reception pit. *See, e.g., Northwestern Nat'l Ins. Co. v. Baltes,* 15 F.3d 660, 662 (7th Cir.1994); Fed.R.Civ.P. 56(e).

It is true that SCS employees were aware of and made appropriate accommodations for the kind of transfer system that Mr. Hammann planned to install. Thus, it would seem from Splett's testimony that he and Mr. Hammann had general discussions about the "pros and cons" of a gravity transfer system as opposed to a pump-driven system and where the storage pond would have to be located depending on which type of system he chose. R. 62 at 34–35, 43. Furthermore, as we have noted, Splett included in his plans for the storage pond a drawing of the transfer pipe, indicating the location as well as the potential diameter of the pipe, depending on whether PVC piping or a concrete culvert were used. A. 10; R. 62 at 53–56; R. 51 at 10, 59–60. Yet, none of this suggests that SCS assumed responsibility for designing and approving either the transfer pipe or the reception pit. Indeed, the record as it stands supports the contrary inference that those details were left to Mr. Hammann and whomever he might choose to consult. Thus, the plans prepared by SCS contain no provisions for the reception pit, nor do they make any provisions for the transfer pipe, with the exception of Splett's drawing showing its location. That exception we do not find particularly significant. It is not surprising that the designer of the storage pond would make some reference to the placement and dimension of the transfer pipe feeding into the pond, and thus indicate how this component of the waste management system would relate to the other components. But it does not necessarily follow that in so demonstrating, the designer of the pond necessarily assumed responsibility for each of the other components. *See Morse/Diesel,* 859 F.2d at 248 (one subcontractor's limited review of another's work did not give rise to a duty of care that would support negligence claim, where review was "merely an incident" to that subcontractor's assigned task).

In a further effort to establish that SCS, if not the County, assumed a duty for the entire waste management system, Ms. Hammann–Stauner produced the affidavits of three experts in the field of agricultural engineering. None of these affidavits, in our view, raises a question as to whether SCS was in fact bound by a duty of care with

respect to the reception pit.[4]

■ Each of the plaintiff's experts operates from the crucial premise that in undertaking to design the storage pond, SCS was bound by a duty to carry out its task mindful of the other components of the waste management system. This notion finds its most articulate expression in the affidavit of Marvin Salzenstein, a private consulting engineer:

> [O]nce a designer undertakes to design a system, he has a duty to understand how all of the components of the system will fit together. It is my opinion that the designer of a system cannot design only one portion or component of the system without taking into consideration the design, configuration, and interconnection of the remaining components of the system.

R. 56 ¶ 3; see also R. 70 ¶ 3 ("SCS had the duty to design the entire waste management system before installing any of the necessary components"); R. 60 ¶ 5 ("animal waste facility components must be designed in an interrelated system"). Of course, the defendants retort that they did not undertake to design a system, but merely one component of it. Anticipating that rejoinder, each of the experts has relied on Specification 425 and its requirement that the storage practice not be installed until each of the other components of the system has been determined. R. 56 ¶ 3; R. 60 ¶ 6; R. 70 ¶ 3. They seem to reason that SCS *could not* limit its undertaking to the design and construction of the pond—that even if it did not formally agree to design the entire system, SCS nonetheless was bound to oversee the design and construction of the other components, or in some way ensure that this was done properly. R. 56 ¶¶ 3–4; R. 60 ¶ 6; R. 70 ¶¶ 3–4. Thus, Gerald Bodman, an agricultural and structural engineer, concludes that "SCS breached [its] duty to design the waste management system when [it] purported to delegate to the landowner, Brad Hammann, the obligation to design the reception pit without mandating

any referral to a competent engineer." R. 70 ¶ 4. If that assertion is correct, then no effort on the part of SCS or the County to limit their involvement in the project to the design and construction of the pond would matter; in agreeing to construct that component, they necessarily assumed a duty with respect to the others.

The missing link we perceive in this reasoning is the *source* of the duty for the entire system. The only concrete basis the experts cite is Specification 425; yet, the language of that provision does not on its face bestow responsibility for all components of the system on the designer of the storage pond. The specification required SCS to postpone construction of the waste practice until all other components of the system had been "determined." A. 21. Yet, "determining" the components would seem to involve no more than deciding what those components would be and how they would fit together. Nothing suggests that this rule was violated here: before the pond was excavated, the other components (e.g., a gravity versus pump transfer system) had been selected and the site was surveyed. This is, so far as we can tell, a rule directed at the mismatch of system components, and that is not the source of injury in this case. To the extent that the plaintiff and her experts would have us read into the specification a far broader duty to design, construct, and certify the safety of every component in the system, they have supplied no foundation for doing so. See *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir.1989) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

Beyond Specification 425, each of the experts has also identified facts which to him suggest that SCS affirmatively accepted responsibility for the waste transfer components of the system. But we are not convinced that any of the circumstances cited

---

4. Beyond suggesting that SCS owed a duty of care with respect to the reception pit, each of the experts considered whether SCS had breached that duty by failing to deliver appropriate admonitions concerning the need for a cover over the pit. Because we conclude that neither of the defendants assumed responsibility for the design and construction of the pit, we focus solely on the portions of the affidavits dealing with the existence of a duty to warn rather than the asserted breach of such duty.

reasonably supports the inference that these experts have drawn. For example, Dr. Richard White, a professor of engineering, concludes from the evidentiary record that SCS provided assistance to Mr. Hammann in siting the reception pit and transfer pipe. R. 60 ¶ 6. This bald assertion is meaningless absent any reference to the particular evidence that supports White's conclusion. Presumably, White relies on Splett's drawing indicating the location and potential diameter of the transfer pipe. As indicated, we do not view that circumstance as an indication that SCS accepted responsibility for more than the pond, and White's affidavit offers us no reason to view it in that way.

 Salzenstein, on the other hand, relies on the fact that an SCS "Quantities and Specifications" form initialed by Splett contains the following, pre-printed statement:

> 6. Manure pump, pipe line, agitating pump supplied by others. Waste Transfer System 358 meets SCS specifications.

R. 56 ¶ 5; *see* A. 11. Salzenstein construes this as a certification by SCS that the components of the transfer system met the requirements of Specification 358, including the requirement that the reception pit be covered. *See* R. 56 ¶ 5. However, we find it difficult to conclude from the somewhat cryptic wording of this statement that SCS undertook to review the components of the transfer system and certify that they complied with Specification 358. Indeed, Splett and Hausner both testified in their depositions that this was simply an indication to the landowner and whomever he retained to design and install the transfer practice that those components should comply with Specification 358. R. 62 at 64; R. 51 at 16–20. Both men reiterated that they, in fact, could not certify that the transfer components satisfied Specification 358, as those portions of the system were beyond their jurisdiction. R. 62 at 64; R. 51 at 17, 19–20, 23, 25.

 Bodman singles out Splett's reference to an "Animal Waste Management System" on the first page of his construction plan (A. 9) and Hausner's completion of a checksheet entitled "Planning and Design Consider-

ations for Waste Management Systems" (R. 61, Dep. Ex. 2 at 6) as evidence that SCS agreed to design an entire system rather than the storage pond alone. R. 70 ¶ 3. Neither of these details is particularly telling. Although Splett may have used the words "waste management system" on the cover page of his plan, the contents of that plan include a design for the pond and nothing more, as we have discussed. Hausner's completion of the "systems" checklist likewise does not suggest a broader undertaking. That pre-printed form merely lists a number of potential projects intended to handle a variety of agricultural wastes, and Hausner completed the form in a fashion indicating that the Hammann farm needed "shaping" of the barnyard area and a storage facility for manure. This does not remotely suggest that SCS undertook to plan a complete waste management system which included a reception pit.

 There remains one final consideration. If the defendants assumed no responsibility for the reception pit, were they nonetheless obligated as parties with knowledge of the importance of a cover over the reception pit to admonish Mr. Hammann as to the need for such a safety measure? *See Restatement (Second) of Torts* § 289, comment *m* (1965); W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 32, at 185 (5th ed. 1984). Assuming that there was such a duty, there is no evidence that it was breached. Although Splett could not specifically recall giving Mr. Hammann a copy of Specification 358, he testified that both it and Specification 425 were typically provided to all landowners who were planning to have waste management systems installed. R. 62 at 58–59, 66, 82–83. On the other hand, Gary Schmiedlin, a District Conservationist, thought it likely that a landowner would have to ask for the specifications before he would be given them. R. 55 at 28. This testimony certainly leaves room for the *possibility* that Mr. Hammann was not made aware of the dangers attending uncovered manure pits. On the other hand, the record is devoid of evidence reasonably suggesting that, in fact,

he was not so warned. Indeed, there is virtually *no* evidence in the record as to what Mr. Hammann knew about the reception pit, what he may have been told in that regard by the defendants, whether he may have asked for or been given Specification 358, what arrangements he made for installation of that component, and who ultimately designed and installed the pit. On this record, a jury could only speculate as to whether the defendants breached any obligation they may have had to apprise Mr. Hammann of the need for a cover over the pit. What the plaintiff needed to produce in this regard was evidence. The regrettable death of her husband and, subsequently, her father-in-law understandably made this task difficult, but it did not relieve her of her evidentiary burden. *See Avery v. Mapco Gas Products, Inc.,* 18 F.3d 448, 453–54 (7th Cir.1994); *Merco Distributing Corp. v. Commercial Police Alarm Co.,* 84 Wis.2d 455, 267 N.W.2d 652, 655 (1978).[5]

### III. CONCLUSION

Because we find the record insufficient to support a finding that the defendants owed a duty of care that would encompass the design or construction of the reception pit in which the plaintiff's decedent met with his death, we agree that the defendants were entitled to summary judgment on the plaintiff's negligence claim.

AFFIRMED.

---

5. Because we conclude that the defendants breached no duty of care to Mr. Hammann with respect to the reception pit, we need not reach

the public policy concerns that the district court believed would bar a finding of proximate cause. *See* R. 73 at 6–7.