**Aja BJERKE, Respondent**

**v.**

**Suzette E. JOHNSON, Appellant,**

**and**

**Kenneth D. Bohlman, Defendant.**

**No. A06–117.**

Supreme Court of Minnesota.

Dec. 27, 2007.

29 Cal.4th 726, 128 Cal.Rptr.2d 762, 60 P.3d 165, 174 (2003).

Dennis P. Moriarty, Kevin J. Wetherille, Jaspers, Moriarty & Walburg, P.A., Shakopee, MN, for Respondent.

John M. Riedy, Jorun Groe Meierding, Maschka, Riedy & Ries, Mankato, MN, for Appellant.

## OPINION

HANSON, Justice.

The issues presented in this appeal are whether a homeowner has a duty to protect a child invitee from sexual abuse by

another adult resident in the home and whether the child has the legal capacity to assume the risk of that abuse. Between the ages of 14 and 18, respondent, Aja Bjerke, stayed at Island Farm, a horse farm owned by appellant Suzette E. Johnson, for progressively longer periods. During this time, Bjerke entered into a sexual relationship with Johnson's adult live-in male friend, Kenneth D. Bohlman. Bohlman was subsequently convicted of criminal sexual conduct stemming from that relationship, and Bjerke brings this negligence action, asserting that Johnson failed to protect her from the sexual abuse.[1] The district court granted partial summary judgment dismissing the negligence claims against Johnson, holding that Johnson had no duty to protect Bjerke and that Bjerke's assumption of the risk of sexual abuse barred Bjerke's claims against Johnson. The court certified these issues for immediate appeal. The court of appeals reversed, and we granted Johnson's petition for review. We affirm the court of appeals, though on slightly different grounds.

Because the issues are presented in the context of a summary judgment motion, we glean the facts primarily from the affidavits submitted by each party in support of and in opposition to that motion. But the parties have agreed that, in addition to the exhibits incorporated in the affidavits, the district court was authorized by the parties to rely on all of the deposition transcripts that were filed with the court. Accordingly, we will not limit our description of the facts to those specifically referred to in the affidavits.

Island Farm is a horse farm owned by Johnson, where she resided with her boyfriend, Bohlman. Johnson often invited children between the ages of 13 and 18 to visit Island Farm and stay for one or two weeks at a time. During these stays, the children would take riding lessons and learn about horses. In the spring of 1997, Aja Bjerke, then age 14, began visiting Island Farm. During her time at the farm, Bjerke took riding lessons and performed basic farm chores. Bjerke also accompanied Johnson and Bohlman to horse shows.

Bjerke's first visits to Island Farm were relatively short, but in July 1997 Johnson asked for and received permission from Bjerke's parents for Bjerke to stay at Island Farm for two-and-a-half weeks. During the next three school years, Bjerke visited the farm on a regular basis. Initially, Bjerke spent one or two weekends each month at the farm. Then she spent the entire summers of 1998 and 1999 at the farm. From September of 1999 through March of 2000, Bjerke spent almost every weekend either at Island Farm or with Johnson and Bohlman at horse shows. Beginning in the spring of 2000, Bjerke resided full-time at Island Farm until her departure in October of 2001 at age 18.

Johnson admitted that she took some level of responsibility for Bjerke when Bjerke stayed at Island Farm. Although Johnson believed that Bjerke remained under her parents' control, she expected Bjerke to mind her manners, to tell someone in the house whenever she would leave, and to follow Johnson's ground rules against swearing, vulgarity, drinking, and fraternization with boys. Johnson said that she imposed these rules so that her name and reputation would not be disparaged by the behavior of those associated with her.

Johnson acknowledged that Bjerke's parents believed that she would keep their

---

1. Bjerke's other claims against Johnson were not addressed on summary judgment, and are not at issue in this appeal. Bohlman is also a defendant in this action, but is not a party to this appeal.

daughter safe from injury. Johnson also had Bjerke's parents sign a release form so that she could obtain medical care for Bjerke if necessary. Bjerke's mother testified that she relied on Johnson and Bohlman as responsible adults to provide the care she was unable to provide while her daughter was away.

No money was paid by the Bjerke family for Bjerke's care, but Johnson indicated that the money was not an issue for her. Due to what she perceived as Bjerke's difficult family life at home, Johnson wanted to expose her to a "more stable environment" at Island Farm. Johnson later told Bjerke's parents that she treated Bjerke like "family."

In April 2002, Bjerke informed law enforcement officials that Bohlman had sexually abused her for several years at Island Farm. Following an investigation into Bjerke's allegations, Bohlman was arrested and subsequently convicted of two counts of first-degree criminal sexual conduct and one count of third-degree criminal sexual conduct.

Bjerke admits that she was not forced to engage in sexual conduct with Bohlman at any time. She also admits that she never informed Johnson of her relationship with Bohlman, but instead went to "considerable lengths" to keep the relationship a secret. When asked why she hid the relationship, Bjerke stated that it was because she loved Bohlman and did not want him to get into trouble.

Bjerke brought this action alleging, in part, that Johnson was negligent in failing to protect her from Bohlman's sexual abuse. Johnson moved for partial summary judgment to dismiss all negligence claims on the grounds that there was no special relationship between Bjerke and Johnson, that the sexual abuse was not foreseeable, and that the defense of assumption of the risk barred Bjerke's claims. The district court granted John-

son's partial summary judgment dismissing the negligence claims on all three grounds, but certified the issues for immediate appeal. The court of appeals reversed, holding that (1) a special relationship had been shown; (2) material fact issues precluded summary judgment on foreseeability; and (3) the doctrine of assumption of the risk did not apply. *Bjerke v. Johnson*, 727 N.W.2d 183, 189–96 (Minn. App.2007).

 On review of a grant of summary judgment, we inquire (1) whether there exists a genuine issue of material fact; and (2) whether the district court erred in its application of the law. *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995). In reviewing the record for the existence of a genuine issue of material fact, we view the evidence "in the light most favorable to the party against whom summary judgment was granted." *O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 892 (Minn.1996). When the relevant material facts are not in dispute, the district court's interpretation of the law is reviewed de novo. *Leamington Co. v. Nonprofits' Ins. Ass'n*, 615 N.W.2d 349, 353 (Minn.2000).

## I.

 The basic elements of a negligence claim are: (1) existence of a duty of care; (2) breach of that duty; (3) proximate causation; and (4) injury. *Schmanski v. Church of St. Casimir of Wells*, 243 Minn. 289, 292, 67 N.W.2d 644, 646 (1954). The existence of a duty of care is the element at issue in this appeal. Generally, we regard the existence of a duty as a question of law, which we review de novo. *H.B. ex rel. Clark v. Whittemore*, 552 N.W.2d 705, 707 (Minn.1996).

 Bjerke does not assert that Johnson negligently caused the sexual abuse, but that Johnson failed to protect Bjerke from such abuse. As a result, spe-

cial considerations come into play. Generally, no duty is imposed on an individual to protect another from harm, even when she "realizes or should realize that action on [her] part is necessary for another's aid or protection." *Delgado v. Lohmar*, 289 N.W.2d 479, 483 (Minn.1979). A duty to protect will be found, however, if (1) there is a special relationship between the parties; and (2) the risk is foreseeable. *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 168–69 (Minn.1989).

## A. Special Relationship

 The first prerequisite to a finding of a duty to protect another from harm is the existence of a special relationship between the parties. A special relationship can be found to exist under any one of three distinct scenarios. The first arises from the status of the parties, such as "parents and children, masters and servants, possessors of land and licensees, [and] common carriers and their customers." *Delgado*, 289 N.W.2d at 483–84; Restatement (Second) of Torts §§ 314A, 315 (1965). The second arises when an individual, whether voluntarily or as required by law, has "custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection." *Harper v. Herman*, 499 N.W.2d 472, 474 (Minn.1993); Restatement (Second) of Torts § 314A (1965). The third arises when an individual assumes responsibility for a duty that is owed by another individual to a third party. For example, one has a duty to act when he "undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things," and liability will be imposed if (1) his failure to act increases the risk of harm; (2) he undertook a duty owed by the other to the third party; or (3) the harm is suffered because the other or the third person relied on the undertaking. *Walsh v. Pagra Air Taxi, Inc.*, 282 N.W.2d 567, 571 (Minn.1979); Restatement (Second) of Torts § 324A (1965). Under the facts presented here, we need consider only the second and third types of special relationships.

As to the second type of special relationship, Bjerke argues that Johnson took custody of her under circumstances in which Bjerke's normal means of self-protection were unavailable. Although Johnson was never given legal custody of Bjerke, there is evidence to show that Johnson accepted entrustment of some level of care for Bjerke when Bjerke stayed at Johnson's home, at a location distant from her parents' home.[2] Johnson provided Bjerke with room and board and adopted rules for Bjerke's conduct. Johnson had a large degree of control over Bjerke's welfare, strongly indicating that there was a special relationship between the two. *See Becker v. Mayo Found.*, 737 N.W.2d 200, 213 (Minn.2007) (finding no special relationship between hospital and child because hospital "did not exercise control over [the child's] daily welfare"); *Harper*, 499 N.W.2d at 474 n. 2 (noting that a typical circumstance in which a duty exists is when the defendant holds "considerable power over the plaintiff's welfare").

There is evidence that Johnson's control over Bjerke increased over time with the increase in the length and frequency of Bjerke's stays at the farm. For purposes of summary judgment, it is enough that we can determine, as a matter of law, that Johnson's custody began at least as early as 1998, when Bjerke resided for the full summer at the farm.

2. *See The Random House Dictionary of the English Language* 494 (2d ed. 1987) (defining "custody" as "keeping; *guardianship; care*") (emphasis added).

We also conclude as a matter of law that, at least during the times that Bjerke resided full-time at the farm during and after the summer of 1998, Bjerke lacked "normal opportunities for self-protection" because she was a minor child, living apart from her parents and under the daily care and supervision of Johnson.

We recognize that children are largely dependent on parents or other custodial guardians for protection, and that such dependence is often the basis for a duty to protect. *See H.B. ex rel. Clark v. Whittemore,* 552 N.W.2d 705, 708 (Minn.1996) (noting that duties to protect "typically involve some degree of dependence"). The natural dependence which Bjerke would have had upon Johnson increased as her stays at the farm became progressively longer. By the summer of 1998, Bjerke was a long-term resident at Island Farm and was consistently away from her family. Although a child who visited Island Farm only sporadically might have been better able to rely on her parents for protection, Bjerke was largely separated from the protection and support that her parents might have otherwise provided. For example, a parent whose child lives with her on a regular basis is more able to observe various changes in that child's behavior that could signal a negative influence on the child's welfare.

The court of appeals concluded that no special relationship existed under Restatement § 314A because Bjerke "was not unable to summon help by virtue of the custody agreement." *Bjerke,* 727 N.W.2d at 189–90. The court went on to conclude that "Bjerke had the same opportunities for self-protection under Johnson's custody as she did under her parents' custody." *Id.* at 190. But, as we noted above, the circumstances of Bjerke's residence at Island Farm substantially deprived her of a child's primary source of protection—her parents. Although Bjerke was not absolutely deprived of the opportunity to rely on her parents for aid—she could have telephoned them from Island Farm or confided in them when she visited home—the Restatement does not require that all opportunities for self-help be lost. The Restatement only requires that Bjerke have been deprived of normal opportunities for protection, not that she have completely lacked any means of protection. Only the most extreme of circumstances would absolutely deprive an individual of her ability to protect herself, and we do not believe that Restatement § 314A is so unduly restrictive in its scope.

Johnson argues that our decision in *H.B.* forecloses the existence of a special relationship under Restatement § 314A. In *H.B.,* we determined that the manager of a trailer park was not negligent for her failure to report the sexual abuse of a number of children by a park resident. 552 N.W.2d at 706. We based our decision on two key facts. First, we observed that "there was no acceptance by [the manager] of the children's entrustment; indeed it was specifically rejected when [she] instructed the children to tell their parents about [the] abuse." *Id.* at 708–09. Second, we noted that "the children were not in [the manager's] custody [and] she exercised no control over their daily welfare." *Id.* at 709.

In contrast, Johnson took Bjerke into her home as a long-term resident, providing her with a place to live away from her family. Additionally, Johnson never disclaimed any responsibility for Bjerke—to the contrary, Johnson made it clear that one of her motivations for bringing Bjerke to stay at Island Farm was to provide her with a more stable environment than could be found in Bjerke's home. Thus, the factors found dispositive in *H.B.* suggest that a special relationship existed between Johnson and Bjerke.

We must also note that *H.B.* provides little support for the argument that Bjerke had the normal opportunities for self-protection. In *H.B.*, the children resided with their parents, to whom they eventually reported their sexual abuse. 552 N.W.2d at 706–07.[3] Though Bjerke was older than the children in *H.B.* at the time she was sexually abused, she lived away from her parents for substantial periods of time in which she was abused. Also, it is notable that the abuse in *H.B.* was perpetrated by an outsider, not a member of the same household. When the perpetrator of sexual abuse resides inside of the victim's home, the child is likely faced with more pressure not to report her abuse. The child is subject to the ongoing influence of the person who abused her, and her ability to stay in the home could be jeopardized if she reported the abuse. None of these special considerations were implicated in *H.B.*

Because Johnson had custody over Bjerke and Bjerke, who, both by virtue of her age and her specific circumstances, lacked normal opportunities for self-protection, we conclude as a matter of law that a special relationship existed from and after the summer of 1998. The decision to the contrary by the district court and the court of appeals is reversed.[4]

Although we agree with Bjerke that a duty has been shown, we hasten to add that this does not mean that Johnson committed any wrongdoing by taking Bjerke

into her custody. Johnson's assumption of the care and custody of Bjerke was generous and admirable. We only conclude that the assumption, however well-meaning, brought with it legal obligations that Johnson would not have otherwise had, obligations sufficient to prevent summary judgment on the issue of a special relationship.

Having determined that the second type of special relationship, as described in Restatement § 314A, has been shown to exist, it is not clear that we need to address the third type of special relationship as described in Restatement § 324A and adopted in *Pagra*, 282 N.W.2d 567. Although this is the section upon which the court of appeals based its decision that a special relationship existed, we do not have a majority of this court in favor of addressing Restatement § 324A, and thus we will make no holding concerning it.

## B. Foreseeability

■■■■■ Even where a special relationship exists, a duty is only imposed if the resulting injury was foreseeable. It is not necessary that a defendant have notice of the exact method in which injury will occur "if the possibility of an accident was clear to the person of ordinary prudence." *Connolly v. Nicollet Hotel*, 254 Minn. 373, 381–82, 95 N.W.2d 657, 664 (1959). When it is clear whether an incident was foreseeable, the courts decide the issue as a matter of law, but in close cases, foreseeability is

---

**3.** Although we briefly touched upon the opportunities for self-protection present in *H.B.*, we had already determined that no custodial relationship existed between the children and the park manager, making any further analysis regarding the manager's duty mere dicta. *See* 552 N.W.2d at 708–09.

**4.** Although we have generally stated that the existence of a duty is a question of law, this would not foreclose the possibility that there may be situations in which the facts necessary

to establish a special relationship are in dispute and should be submitted to the jury. For example, if it were relevant or necessary at trial for Bjerke to establish that a special relationship existed prior to the summer of 1998, our conclusion that a special relationship existed as a matter of law by the summer of 1998 would not preclude the argument that there may be genuine issues of material fact concerning the earlier existence of the special relationship that would warrant submission of that issue to the jury.

reserved for the jury. *Whiteford ex rel. Whiteford v. Yamaha Motor Corp.*, 582 N.W.2d 916, 918 (Minn.1998).

Viewing the evidence in the light most favorable to Bjerke, we conclude that summary judgment was inappropriate on the issue of foreseeability. This is because questions of material fact exist as to the foreseeability of any sexual abuse that occurred between early 1997, when Aja Bjerke first began staying at Island Farm, and October of 2001, when Bjerke left the farm for the last time.

The evidence shows that Johnson, as well as many of her friends and associates, observed unusual and intimate behavior between Bohlman and Bjerke over this entire period. Johnson observed inappropriate behavior between Bohlman and Bjerke as early as the summer of 1997. Johnson saw Bohlman sitting with his back up against a couch, while Bjerke sat on the couch and ran her fingers through his hair for 10 to 15 minutes. Johnson subsequently confronted Bohlman to inform him that she did not find such conduct appropriate. Johnson believed this conduct to be the "kind of conduct a girlfriend would have exhibited as opposed to a daughter" and admitted that it may have had sexual overtones. When Johnson later mentioned this incident to a friend who was a county child protection worker, her friend agreed that it was "inappropriate for a fourteen-year-old girl to interact with a man * * * in his fifties that way." Following her conversation, Johnson felt that she should "keep [her] eyes open."

Johnson observed other unusual behavior between Bohlman and Bjerke. In general, she saw that Bohlman and Bjerke had a "space issue" when they were together. Also, in April of 2000, while at a 4–H judge's clinic, Johnson saw Bjerke come around her and jump into Bohlman's lap as he was sitting next to Johnson. Johnson and a woman seated nearby both believed this behavior to be "very odd." This conduct would have occurred around Bjerke's seventeenth birthday.

A friend of Johnson's testified that Johnson later saw other instances of inappropriate behavior between Bohlman and Bjerke. He stated that, in the early winter or spring of 2000, Johnson came to his home and said that "she had to get out of the house because it was getting too sexual between [Bohlman and Bjerke], it * * * wasn't a father-daughter thing, it was getting too sexual so she had to leave." Sometime after this incident, this friend observed Bjerke rubbing Bohlman's leg in the kitchen, in full view of Johnson who was sitting in the dining room.

Several other friends and acquaintances of Johnson observed the interaction between Bohlman and Bjerke and suspected that something was unusual about their relationship. One stated that Bohlman and Bjerke were "quite open about a lot of their emotions." Bjerke's mother was concerned that her daughter's relationship with Bohlman was inappropriate. That concern was also reinforced by the observations of Johnson's friends of the interaction between Bohlman and Bjerke.

After the August 2000 funeral of Johnson's father, another friend saw Bjerke and Bohlman acting in a way that she considered to be "too intimate" and that made her uncomfortable. She also saw Bohlman and Bjerke engage in flirtation "many times." She stated that most of the individuals she spoke to had "observed things" regarding the Bjerke–Bohlman relationship. Aside from these specific observations, it also appears that rumors generally were circulating regarding Bjerke and Bohlman.

It is particularly notable that even those who spent less time with Bohlman or Bjerke than Johnson had suspicions about the nature of their relationship. If those who spent little time at Island Farm saw

enough unusual behavior to give them cause for concern, it would be reasonable to infer that Johnson, who lived full-time at Island Farm, came to the same conclusions herself. This conclusion is further bolstered by the fact that Bohlman's abuse of Bjerke was not a short-term, isolated incident, but continued uninterrupted for nearly four years.

Because there was a special relationship between Johnson and Bjerke and the evidence presents genuine issues of material fact on foreseeability, summary judgment for Johnson on the issue of duty was erroneous and is reversed.

## II.

■ We turn next to Johnson's argument that, even if she was under a duty to protect Bjerke, Bjerke assumed the risk of her sexual abuse. Johnson bases this argument on Bjerke's admission that she was never forced to have sex with Bohlman and that she took affirmative steps to conceal their sexual relationship.

■ Two varieties of assumption of the risk are recognized in this state, each with its own effect on a defendant's liability. The variety at issue in this appeal is termed "[p]rimary assumption of [the] risk," and arises "only where parties have voluntarily entered a relationship in which plaintiff assumes well-known, incidental risks." *Olson v. Hansen,* 299 Minn. 39, 44, 216 N.W.2d 124, 127 (1974). Primary assumption of the risk completely negates a defendant's negligence. *Id.,* 216 N.W.2d at 127.[5]

We have previously allowed primary assumption of the risk as a defense to some actions involving minors. *See Greaves v. Galchutt,* 289 Minn. 335, 184 N.W.2d 26 (1971) (barring recovery in accidental shooting death of 11–year–old child). On the other hand, the consent of a minor has been firmly rejected as a defense to a criminal prosecution for the sexual abuse of a child. *See* Minn.Stat. § 609.342, subd. 1 (2006); Minn.Stat. § 609.343, subd. 1 (2006); Minn.Stat. § 609.344, subd. 1 (2006) (stating that "consent to the act by the complainant shall [not] be a defense" to criminal sexual conduct involving a minor). Whether consent can form the basis of an affirmative defense of assumption of the risk in a civil suit concerning the sexual abuse of a child, however, is an issue of first impression in this state.[6]

---

**5.** The second variety is termed "secondary assumption of [the] risk," and arises when the plaintiff has made a "voluntary choice to encounter a known and appreciated danger created by the negligence of the defendant." *Olson,* 299 Minn. at 45, 216 N.W.2d at 128. Secondary assumption of the risk does not automatically bar a plaintiff's recovery, but is treated as a form of contributory negligence decreasing the plaintiff's damages under Minn.Stat. § 604.01, subd. 1 (2006). *Springrose v. Willmore,* 292 Minn. 23, 24–25, 192 N.W.2d 826, 827 (1971). Given that secondary assumption of the risk is not an absolute defense, but only acts to decrease the plaintiff's recovery, the applicability of that doctrine is not properly before us on appeal from a grant of summary judgment, and we express no opinion as to how this issue should be resolved at trial.

**6.** Although this issue is one of first impression in Minnesota, it has been addressed in many other jurisdictions over the past century. A number of courts have concluded that the consent of a minor is irrelevant and that assumption of the risk is inapplicable to a claim of sexual abuse. *See Bohrer v. DeHart,* 943 P.2d 1220, 1227 (Colo.Ct.App.1996) (consent no defense in civil actions); *Wilson v. Tobiassen,* 97 Or.App. 527, 777 P.2d 1379, 1384 (1989) (criminal bar on consent defense applicable in civil actions); *Robinson v. Moore,* 408 S.W.2d 582, 583 (Tex.Civ.App. 1966) (consent no defense in civil action); *Elkington v. Foust,* 618 P.2d 37, 40 (Utah 1980) (same); *Christensen v. Royal Sch. Dist. No. 160,* 156 Wash.2d 62, 124 P.3d 283, 286– 87 (2005) (noting that normal contributory fault principles are "not germane" to sexual abuse cases). But a number of courts have reached the contrary conclusion. *See Beul v.*

Minnesota has expressed a particularly strong interest in protecting children from sexual abuse. This interest is best reflected in our criminal laws, which render consent irrelevant in criminal prosecutions for the sexual abuse of a child. *See, e.g.,* Minn.Stat. § 609.342, subd. 1. We have characterized this law as reflecting "the feeling of society in general that sexual contact by adults with children * * * is reprehensible whether or not the child consents, because at that age, the child should be deemed incapable of giving consent." *State v. Steinbrink,* 297 N.W.2d 291, 293 (Minn.1980). The Utah Supreme Court has similarly observed that child sexual abuse is "so contrary to commonly accepted standards of decency and morality that any consensual agreement to engage in such conduct would be rejected by the law as against public policy and void." *Elkington v. Foust,* 618 P.2d 37, 40 (Utah 1980).

Beyond the strong public interest in protecting children from sexual abuse, it seems to us unlikely that children can be expected to comprehend the multitude of long-term effects of sexual abuse by an adult. Aside from the immediate dangers,

a victim of sexual abuse faces the risk of "depression and other psychosocial disorders, promiscuity, and revictimization" as well as "guilt, shame, phobias, and eating disorders." Michelle Oberman, *Regulating Consensual Sex With Minors: Defining A Role For Statutory Rape,* 48 Buff. L.Rev. 703, 728–29 (2000). Such abuse can lead to "lower self-esteem, higher rates of emotional distress, and considerably elevated rates of suicide and self-harm." *Id.* at 729. Because a plaintiff's ability to appreciate the danger arising from her behavior is a key component of assumption of the risk, *Knutson v. Arrigoni Bros. Co.,* 275 Minn. 408, 413–14, 147 N.W.2d 561, 566 (1966), we find it difficult to conclude that children could meaningfully assume the risks of sexual assault.[7]

Although it might be argued that the facts in this case go beyond mere consent, given Bjerke's admission that she took efforts to conceal her relationship with Bohlman, we are not convinced that this is a meaningful distinction. As we noted above, a number of pressures are placed on a child to consent to the sexual abuse of an adult. To presume that such pressures begin and end simply with the child's con-

ASSE *Int'l, Inc.,* 233 F.3d 441, 450–51 (7th Cir.2000) (consent of minor relevant for purpose of comparative fault); *Harvey Freeman & Sons, Inc. v. Stanley,* 259 Ga. 233, 378 S.E.2d 857, 859 (1989) (assumption of risk valid consideration in sexual abuse suit by 14-year-old girls against building manager); *L.K. v. Reed,* 631 So.2d 604, 608 (La.Ct.App. 1994) (minor girl's consent to sex relevant for purpose of comparative fault); *Tate v. Bd. of Educ., Prince George's County,* 155 Md.App. 536, 843 A.2d 890, 901 (Ct.Spec.App.2004) (teenage girl assumed risk of sexual abuse by uncle); *Braun v. Heidrich,* 62 N.D. 85, 241 N.W. 599, 601 (1932) (minor girl violated state fornication law, thus barring claim for damages); *Barton v. Bee Line, Inc.,* 238 A.D. 501, 265 N.Y.S. 284, 285 (N.Y.App.Div.1933) (society adequately protected by criminal statute, rendering damage award for consensual act unnecessary); *Parsons v. Parker,* 160 Va.

810, 170 S.E. 1, 3 (1933) (consent of minor relevant as mitigation of punishment). In *Doe ex rel. Roe v. Orangeburg County Sch. Dist. No. 2,* the South Carolina court held that consent was irrelevant to liability but may be relevant to damages. 335 S.C. 556, 518 S.E.2d 259, 261 (1999).

7. Studies have further shown that "as the age difference between the young woman and her partner increased, the * * * degree to which she 'wanted' to participate in the sexual act decreased. This finding indicates the likelihood of a greater power differential * * * and that the episode may not have been voluntary." Gary Harper, *Contextual Factors That Perpetuate Statutory Rape: The Influence of Gender Roles, Sexual Socialization and Sociocultural Factors,* 50 DePaul L.Rev. 897, 912–13 (2001) (footnotes omitted).

sent would be to ignore the disparity of power that typifies the relationship between the abuser and his victim. The pressures brought by the adult to procure the child's participation in sexual activity can be the same pressures that procure the child's silence. Given the impossibility of separating the pressures that give rise to a victim's consent from those that lead the victim to conceal her abuse, we do not believe that even active concealment by a minor victim of sexual abuse is sufficient to establish the defense of primary assumption of the risk.

Some courts have expressed concern that prohibiting evidence of consent "allow[s] a victim to * * * tell a one-sided version of events, without being subject to any real cross-examination or impeachment as to the damages actually suffered." *Doe ex rel. Roe v. Orangeburg County Sch. Dist. No. 2*, 335 S.C. 556, 518 S.E.2d 259, 261 (1999). Our disposition today does not implicate this concern for three reasons. First, given the procedural posture of this case, we address only primary assumption of the risk—an absolute defense to liability—and do not consider whether the plaintiff's claims might be considered under the doctrine of secondary assumption of the risk. Second, we express no opinion on the extent to which a child victim's actions can be considered by the jury in analyzing a defendant's negligence. Third, we similarly express no opinion on the relevance of evidence of the child's conduct on issues of damages.

We hold that the defense of primary assumption of the risk is unavailable as a matter of law in cases concerning the sexual abuse of a child. Accordingly, we affirm the court of appeals' decision to reverse the grant of partial summary judgment and we remand to the district court for further proceedings.

Affirmed.

HANSON, J., files a concurring opinion in which ANDERSON, RUSSELL A., C.J., joins.

ANDERSON, G. BARRY, J., files a dissenting opinion in which PAGE and GILDEA, JJ., join.

HANSON, Justice (concurring).

I write separately because I would conclude that the third type of special relationship, as described in Restatement (Second) of Torts § 324A (1965), should be addressed. The district court ruled that this type of special relationship could not be shown and that ruling might become material in the trial. Further, I would conclude that the third type of special relationship has been shown under the facts presented.

Under Restatement § 324A and our decision in *Walsh v. Pagra Air Taxi, Inc.*, the third type of special relationship would exist if it is shown that Johnson (1) undertook, whether gratuitously or for consideration, to render services to Bjerke's parents (2) which Johnson should have recognized as being necessary for Bjerke's protection. *See* 282 N.W.2d 567, 571 (Minn.1979).

As to the first element, I would conclude as a matter of law that, at least as early as the summer of 1998, Johnson gratuitously undertook to provide a large portion of the services that Bjerke's parents were otherwise obligated to provide to Bjerke. Because Bjerke was an unemancipated minor at the time Johnson brought her into her home, the provision of Bjerke's basic necessities was the responsibility of Bjerke's parents. By providing Bjerke with such necessities, Johnson effectively rendered a service to Bjerke's parents, similar in kind to those provided by a baby-sitter, though Johnson's services were much greater in scope. Given that even a baby-sitter is expected to provide some basic services to

the child in her care—food, supervision, and protection from harm—a homeowner who brings a minor child to live in her household long-term would naturally be expected, at very least, to provide such basic services as well.

Johnson argues that an "undertaking" exists only when there is an explicit agreement between the person providing the service and the individual to whom that service is provided. She argues that no explicit agreement was ever reached between herself and Bjerke's parents for Johnson to provide services to Bjerke on behalf of Bjerke's parents. Such an interpretation of Restatement § 324A has been rejected in our prior cases, has not been adopted in the decisions of any other jurisdiction, and is not supported by public policy considerations.

Of course, the Restatement is a generalized summary of American common law and not a pronouncement of our legislature. Thus, we are not bound by rules of statutory construction and may use the Restatement for guidance in informing our own view of the common law in Minnesota. But even if one were to read section 324A of the Restatement like a statute and focus on the intended meaning of the word "undertaking," that term is not as limited as Johnson suggests. Dictionary definitions suggest two alternatives, defining "undertake" as *either* "to take upon oneself, as a task, performance, etc.; attempt" *or* "to promise, agree, or obligate oneself." *The Random House Dictionary of the English Language* 2064 (2d ed. 1987). In other words, although a promise may be sufficient to establish an undertaking, it is not necessary for an undertaking to occur. In common usage, one can be said to have undertaken a task at the moment she begins that task, regardless of whether a promise to begin that task might also be involved.

This distinction actually played a determinative role in our decision on special relationships in *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165 (Minn.1989). In that case, the defendant security company argued that it had no duty, under Restatement § 324A, to protect the plaintiff from harm in a parking garage because the plaintiff was not a customer of the hotel with which the defendant had contracted, but only a patron of the parking garage that the defendant patrolled pursuant to a contract with the hotel. *Id.* at 170. We rejected the defendant's argument and held that the security company's actions constituted an undertaking to perform the duty of the parking garage operator to protect its customers. *Id.* If a contract or other explicit agreement were necessary to establish a special relationship, the result reached in *Erickson* would not have been possible, given the lack of any explicit agreement between the security company and the parking garage operator.

A review of the case law under Restatement § 324A, and the similar provisions of Restatement (Second) of Torts § 323 (1965), fails to reveal a single case that has made the existence of an explicit promise necessary in order to establish an undertaking under either section. Of course, a number of those cases present the situation in which some form of contract or agreement to act for the benefit of another was present. We found the existence of such a contract when we imposed a duty on the defendants in *Pagra*, for instance. *See* 282 N.W.2d at 570 (imposing liability under Restatement § 324A because, "[b]y the terms of its operating agreement with the city, Pagra agreed to undertake the fire-protection duty assumed by the city").

Naturally, a contract will provide compelling evidence that one party has undertaken some kind of responsibility for another. But that does not mean that a

contract or express agreement is necessary when the undertaking has been shown by the party's conduct. *See, e.g., Indian Towing Co. v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955) ("[O]nce [the Coast Guard] exercised its discretion to [provide a lighthouse service] and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order."); *Erickson,* 447 N.W.2d at 170 (rejecting defendant's argument that it could not be held liable because plaintiff was not customer of party with whom defendant had contracted); *Williams v. State,* 34 Cal.3d 18, 192 Cal.Rptr. 233, 664 P.2d 137, 141 (1983) (concluding that "a promise and reliance thereon are [not] indispensable elements of a special relationship"); *Smith v. Allendale Mut. Ins. Co.,* 410 Mich. 685, 303 N.W.2d 702, 718–19, n. 49 (1981) (determining that an undertaking may arise either from defendant's explicit promise or from defendant's representations).[1]

Further, to adopt Johnson's interpretation would effectively blur the distinction between contract and tort law. If an express promise were required on behalf of both parties every time a duty was to be imposed, it would be all but impossible to show a duty to protect under section 324A without proving the existence of a contract. As the Michigan Supreme Court has observed, however, there are important distinctions between the interests served by contract law and tort law, respectively:

> Although in analyzing what constitutes an "undertaking" under § 324A, we use terms with contract law overtones, such as "agreed" or "intended to benefit another," it should be emphasized that we are determining when an "undertaking" will give rise to tort liability, not contractual liability. We deal with the question of when a party's conduct furnishes a proper basis for the law to impose tort liability, not with the question of when a party's conduct can properly be considered as creating a contract implied in fact.
>
> In an action to recover damages for breach of a contract a court is concerned primarily with determining the expectations of the parties and whether those expectations were reasonable. In imposing tort liability, however, a court is only concerned with whether it is appropriate public policy to impose liability for particular conduct; it does not usually consider whether the parties involved believed liability to exist. * * *
>
> Although considerations appropriate in a contractual context may also be relevant in the tort context, differences in the relevant public policies, extent of liability, the nature of the relationships and the expectations of the persons involved, suggest that the question of what conduct amounts to an undertaking for the negligent performance of which the law will impose tort liability should not be confined by principles of contract law.

*Allendale,* 303 N.W.2d at 711 n. 24.

This general refusal to restrict tort liability by contractual notions is further illustrated by well-known tort principles— no agreement is required before an individual will be held liable for attempting and negligently failing to provide assistance to another, as the actual conduct of the actor is all that is relevant. *See, e.g., Slater v. Ill. Cent. R.R. Co.,* 209 F. 480, 483 (M.D.Tenn.1911) (finding railroad liable in negligence when it "assume[d] control of the injured person over his protest and

---

1. The proposed final draft of the Restatement (Third) of Torts: Liability for Physical Harm, § 43 cmt. h (Proposed Final Draft No. 1, 2005), specifies that, "The duty imposed by this section is independent of any contractual obligations."

with knowledge of the imminent peril due to his condition"); *Farwell v. Keaton,* 396 Mich. 281, 240 N.W.2d 217, 220 (1976) ("Without regard to whether there is a general duty to aid a person in distress, there is a clearly recognized legal duty of every person to avoid any affirmative acts which may make a situation worse."); *Dunham v. Village of Canisteo,* 303 N.Y. 498, 104 N.E.2d 872, 875 (1952) (defendants, "having assumed charge of the deceased * * * were under an obligation to exercise ordinary care"). As Judge Benjamin Cardozo once stated, "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275, 276 (1922).

Also, it would not serve public policy to make the responsibility of an adult for the welfare of a child turn solely upon the existence of an agreement between that child's caregiver and her parents. Because the duty to protect would then only exist in the specific circumstances covered by the parties' agreement, any circumstances beyond the scope of the agreement would presumably remain within the general duties of the parents, even though they were not in a position to perform those duties. As a result, there would be a "dead zone" in which the custodian, who was in the best position to care for the child, would have no duty to do so, while the parents, who were too distant to actually care for the day-to-day needs of the child, would retain the duty to do so.

Moreover, the ultimate dispute here is not between Johnson and Bjerke's parents, but between Johnson and Bjerke. To make the parties' agreement determinative would be to ignore the expectations of the child herself and make the imposition of a duty turn on the wishes of potentially irresponsible parents and their chosen caregivers. It is Bjerke who has brought this action and it is her relationship to Johnson that is determinative.

Finally, it should be noted that the duties of the caretaker and the parents need not be mutually exclusive, but can be shared and overlap.[2] As legal custodians and guardians, the parents have duties that remain their ultimate responsibility, even if those duties are temporarily shared with or delegated to another. That is not to say, however, that a caregiver cannot become responsible for some parental duties by undertaking to perform them, even though the parents retain concurrent responsibility. For example, it is settled law that parents have a duty to protect their children, and that common carriers have a duty to protect their patrons. *See Delgado v. Lohmar,* 289 N.W.2d 479, 483–84 (Minn.1979). When a parent and her child board a cruise liner, though, few would say that either the duty of the parent or that of the operator of the ship has been negated.

If Johnson undertook to render a service to Bjerke's parents when she brought Bjerke into her home for the summer of 1998, the question becomes whether (1) her failure to act increased the risk of harm; (2) she undertook a duty owed to Bjerke by her parents; or (3) the harm to Bjerke was suffered because Bjerke's parents relied on Johnson's performance of the undertaking. *See Pagra,* 282 N.W.2d at 571. As to the second prong, I would conclude that Johnson undertook a number of the duties normally owed by parents to their children. Johnson undertook to provide Bjerke with room and board, as

---

**2.** The proposed final draft of Restatement (Third) of Torts: Liability for Physical Harm, § 43 cmt. g, illus. 2 (Proposed Final Draft No. 1, 2005), indicates that, "The actor who en-

gages in an undertaking need not completely displace the person originally owing the duty."

well as a level of guidance that she felt was lacking in Bjerke's own home. It is hard to dispute that these are all things which any parent has a duty to provide to her child. In the alternative, under the third prong, I would also conclude that the harm was suffered in some part because Bjerke's parents relied upon Johnson to look after their daughter. Bjerke's mother herself stated that she relied on Johnson as a responsible adult to care for Bjerke during her stays at Island Farm, and nothing in the record would indicate that Bjerke's parents would have allowed her to remain at Island Farm if they believed that Johnson was not protecting their daughter from sexual abuse.

Accordingly, I would conclude as a matter of law that the elements necessary to show the existence of a special relationship under Restatement § 324A have been met by Johnson's provision of services to Bjerke's parents, at least as early as the summer of 1998.

ANDERSON, RUSSELL A., Chief Justice (concurring).

I join in the concurrence of Justice Hanson.

ANDERSON, G. BARRY, Justice (dissenting).

I respectfully dissent. The majority holds that Johnson's provision of room, board, and a stable home environment to Bjerke for an entire summer gave rise to a special relationship that imposed on Johnson the duty to protect Bjerke from Bohlman's sexual abuse. Notwithstanding the disturbing events that underlie this litigation, I conclude that a special relationship did not exist between Johnson and Bjerke and that Johnson thus had no duty to protect Bjerke from Bohlman. I would therefore reverse the decision of the court of appeals and reinstate the district court's order of partial summary judgment.

We have previously recognized "the general common law rule that a person does not have a duty to give aid or protection to another or to warn or protect others from harm caused by a third party's conduct." *H.B. ex rel. Clark v. Whittemore*, 552 N.W.2d 705, 707 (Minn.1996); *see also Delgado v. Lohmar*, 289 N.W.2d 479, 483 (Minn.1979); *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801, 804 (Minn.1979) (citing Restatement (Second) of Torts § 315 (1965)). But "[a]n exception to this general rule arises where the harm is foreseeable and a special relationship exists between the actor and the person seeking protection." *H.B.*, 552 N.W.2d at 707; *see also Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 168 (Minn.1989); *Delgado*, 289 N.W.2d at 483; *Cracraft*, 279 N.W.2d at 804 (citing Restatement (Second) of Torts § 315). I do not agree with either the majority's interpretation of the Restatement or the majority's characterization of the record.

I.

We have held that a "special relationship" giving rise to a duty to protect exists where a person has "custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection." *Harper v. Herman*, 499 N.W.2d 472, 474 (Minn.1993) (citing Restatement (Second) of Torts § 314A) (1965).[1] The majority concludes

1. Restatement (Second) of Torts § 314A provides:

 (1) A common carrier is under a duty to its passengers to take reasonable action
 (a) to protect them against unreasonable risk of physical harm, and
 (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
 (2) An innkeeper is under a similar duty to his guests.

that Johnson's duty to protect Bjerke arose under *Harper* and section 314A because "Johnson accepted entrustment of some level of care for Bjerke" which deprived Bjerke of her parents' protection. I agree with the conclusion of the court of appeals that a special relationship did not exist between Johnson and Bjerke under section 314A because "the custodial arrangement did not deprive Bjerke of normal opportunities of self-protection." *Bjerke v. Johnson*, 727 N.W.2d 183, 189 (Minn.App.2007).

In *H.B.*, four girls between the ages of four and seven who lived at a trailer park informed the park manager that another resident had molested them. 552 N.W.2d at 707. The manager instructed the girls to tell their parents, but the abuse continued for approximately three weeks before the children did so. *Id.* We held that no special relationship existed because the manager did not have custody of the children, *id.* at 708–09, and we noted that "the dissent's assertion that the children were unable to protect themselves is questionable at best, for it is undisputed that some three weeks later they did indeed protect themselves by * * * report[ing] the abuse to their parents," *id.* at 709.

If young girls between the ages of four and seven are capable of self-protection for purposes of section 314A, then a teenager such as Bjerke is also capable of self-protection. The majority attempts to distinguish *H.B.* on the basis that whereas

the victims in that case resided with their parents and were sexually abused by an outsider, Bjerke resided apart from her parents when much of the abuse occurred and the abuse was perpetrated by a member of her de facto household. But Bjerke's living arrangement does not negate the fact that she, as a teenager, had a greater capacity for self-protection than did the young children in *H.B.* Bjerke could have protected herself by disclosing her relationship with Bohlman to any number of people—not only her parents, but also teachers, counselors, or even Johnson. Additionally, just as the victims in *H.B.* availed themselves of protection by informing their parents of the abuse, Bjerke ultimately informed her parents of Bohlman's abuse as well.[2]

As we stated in *H.B.*, "requiring [the park manager] to take protective measures on [the victims'] behalf is emotionally appealing, but is based on a factual as well as a legal misapprehension of the circumstances here." *Id.* Because Bjerke was not deprived of normal opportunities of self-protection, I would hold that a special relationship did not exist between Johnson and Bjerke under section 314A.[3]

## II.

We recognized in *Walsh v. Pagra Air Taxi, Inc.*, 282 N.W.2d 567, 570–71 (Minn. 1979), that a duty to protect may also arise

---

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

**2.** The majority notes that "a parent whose child lives with her on a regular basis is more

able to observe various changes in that child's behavior that could signal a negative influence on the child's welfare." For purposes of section 314A, however, we are only concerned with the availability of normal opportunities of *self-protection*, not whether a child's circumstances are conducive to being protected by another.

**3.** The imposition of section 314A liability in this case is further complicated because the abuse was occurring prior to Bjerke's residence at Island Farm.

under Restatement (Second) of Torts § 324A (1965), which provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform][4] his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The majority does not address whether a special relationship existed between Johnson and Bjerke under section 324A, but the concurrence concludes that a special relationship did exist under section 324A. Because I do not believe that a special relationship existed under section 314A, it is necessary to address section 324A. A careful assessment of section 324A and its application by this court and other courts reveals that no special relationship existed between Johnson and Bjerke under that provision.

### The Scope of Johnsons Duty

The concurrence notes that "Johnson gratuitously undertook to provide a large portion of the services that Bjerke's parents were otherwise obligated to provide to Bjerke." From this observation, the concurrence leaps to the conclusion that the preliminary language of section 324A is satisfied without assessing the scope of the duty assumed by Johnson. The proper application of section 324A, however, requires us, as a threshold matter, to determine the scope of the duty assumed by Johnson.

"An actor's specific undertaking of the services allegedly performed without reasonable care is a threshold requirement to section 324A liability." *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1493 (8th Cir. 1997); *see also Patentas v. United States*, 687 F.2d 707, 716 (3d Cir.1982) ("The foundation of the good [S]amaritan rule [found in sections 323 and 324A] is that the defendant specifically has undertaken to perform the task that he or she is charged with having performed negligently."); *Blessing v. United States*, 447 F.Supp. 1160, 1188–89 (E.D.Pa.1978) ("The foundational requirement of the good Samaritan rule is that in order for liability to be imposed upon the actor, he must specifically have undertaken to perform the task that he is charged with having performed negligently * * *."). Or, as stated by the court of appeals in this case, "The extent of the duty owed under section 324A is defined by the extent of the undertaking." *Bjerke*, 727 N.W.2d at 190; *see also Homer v. Pabst Brewing Co.*, 806 F.2d 119, 121 (7th Cir.1986) ([T]he scope of the duty is limited by the extent of the undertaking.); *McGee ex rel. McGee v. Chalfant*, 248 Kan. 434, 806 P.2d 980, 985 (1991) ("The extent of the undertaking should define the scope of the duty.").

---

**4.** Although we did not note the error in *Pagra*, "[t]he reporter for this edition of the Restatement * * * has verified that the word 'protect' which appears at this point is a typographical error and should read 'perform.'" *Hill v. U.S. Fid. & Guar. Co.*, 428 F.2d 112, 115 n. 5 (5th Cir.1970); *see also Artiglio v.*

*Corning Inc.*, 18 Cal.4th 604, 76 Cal.Rptr.2d 479, 957 P.2d 1313, 1317 n. 4 (1998); *Smith v. Allendale Mut. Ins. Co.*, 410 Mich. 685, 303 N.W.2d 702, 706 n. 4 (1981); *Miller v. Bristol–Myers Co.*, 168 Wis.2d 863, 485 N.W.2d 31, 38 n. 7 (1992).

Therefore, in order for a special relationship to have existed between Johnson and Bjerke under section 324A, Johnson must have specifically undertaken to protect Bjerke from third parties at Island Farm. But the record reflects that Bjerke was responsible for herself while at the farm, that her parents never transferred primary control over her to Johnson, and that Bjerke spent little time with Johnson at the farm. In fact, Johnson believed that she had no more authority over Bjerke than did Bohlman or the farm manager. The extent of Johnsons undertaking was to provide Bjerke with room, board, and a very limited degree of supervision. She may have had a duty under section 324A to perform these services with reasonable care, an issue not present in this litigation, but she did not assume the duty of protecting Bjerke from third parties at Island Farm.

We have never imposed a duty under section 324A that exceeded the scope of the undertaking. In *Erickson,* we held that a security firm hired by the owner of a parking ramp owed a duty of reasonable care to a customer of the ramp lessee because the firm undertook to protect the lessee's customers by actively patrolling the ramp. 447 N.W.2d at 167, 170–71. Similarly, in *Pagra,* we concluded that a city owed a duty to a pilot whose plane was destroyed by fire because the city "voluntarily undertook to render fire protection services to airport users." 282 N.W.2d at 570. Johnson, in contrast, did not voluntarily undertake to protect Bjerke from third parties at Island Farm.

Because Johnson did not assume the duty to protect Bjerke from third parties at Island Farm, that duty remained with Bjerke's parents. The Minnesota statute governing the termination of parental rights exemplifies the principle that parents have ultimate responsibility for their children: "[T]he duties imposed upon [a] parent by the parent and child relationship * * * includ[e] * * * providing the child with necessary food, clothing, shelter, education, and *other care and control necessary for the child's physical, mental, or emotional health and development.*" Minn.Stat. § 260C.301, subd. 1(b)(2) (2006) (emphasis added). Just as we are "[r]eluctant * * * to terminate parental rights in all but the most egregious of cases," *In re C.K.,* 434 N.W.2d 925, 926 (Minn.1989), we should also be reluctant to transfer parental duties to third parties. A parent's abdication of his or her parental duties does not effectuate the transfer of those duties to another.

The scope of any duty assumed by Johnson with respect to Bjerke did not encompass the duty to protect Bjerke from third parties at Island Farm; therefore, I would hold that a special relationship did not exist between Johnson and Bjerke under section 324A.

*Section 324A(a)*

Even if I were to concede that Johnson undertook to protect Bjerke from third parties at Island Farm, I would conclude that a special relationship did not exist between Johnson and Bjerke under section 324A(a), (b), or (c). Johnson and Bjerke did not have a special relationship under section 324A(a) because, although Johnson's intervention could have prevented or mitigated the harm to Bjerke, her failure to intervene did not *increase* the risk of harm to Bjerke. In *Cracraft,* we set forth the factors to be considered in determining whether a municipality owes a special duty to a member of the public. 279 N.W.2d at 806–07. Citing section 324A(a), we stated that "the municipality must use due care to avoid increasing the risk of harm." *Id.* at 807. Assessing this factor in *Andrade v. Ellefson,* we explained that "[i]f Anoka County had discovered the alleged existing

danger in the Ellefson home, it may be plaintiffs would not have been harmed, but that is a failure to decrease, not increase the risk of harm." 391 N.W.2d 836, 843 (Minn.1986).

Likewise, the United States Court of Appeals for the Sixth Circuit explained that the test under section 324A(a) "is not whether the risk was increased over what it would have been if the defendant had not been negligent. Rather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking."[5] *Myers v. United States,* 17 F.3d 890, 903 (6th Cir.1994); *see also Canipe v. Natl. Loss Control Serv. Corp.,* 736 F.2d 1055, 1062 (5th Cir.1984) (This subsection [324A(a)] requires some change in conditions that increases the risk of harm to the plaintiff over the level of risk that existed before the defendant became involved.); *Deines v. Vermeer Mfg. Co.,* 752 F.Supp. 989, 995 (D.Kan.1990) ("[M]ere negligence in failing to discover a danger on the part of a defendant * * * would not subject the defendant to liability under § 324A(a)."); *Derosia v. Liberty Mut. Ins. Co.,* 155 Vt. 178, 583 A.2d 881, 887 (1990) (interpreting section 324A(a) "as a section intended to describe negligent conduct that directly increases risk of harm"); *Butler v. Advanced Drainage Sys., Inc.,* 282 Wis.2d 776, 698 N.W.2d 117, 127 (Ct.App.2005)

(concluding that, under section 324A(a), "the actor's failure to exercise reasonable care in performing the undertaking must increase the risk of harm over that which would have existed had the defendant not engaged in the undertaking at all"), *aff'd on other grounds,* 294 Wis.2d 397, 717 N.W.2d 760 (2006). Even assuming that Johnson actually undertook to protect Bjerke from third parties at Island Farm, Johnson's inaction did nothing to increase the risk of harm to Bjerke over what it would have been had Johnson not engaged in that undertaking. Johnson's intervention might have *prevented* Bjerke from suffering harm, but, as we stated in *Andrade,* "this is a failure to decrease, not increase the risk of harm." 391 N.W.2d at 843.

### *Section 324A(b)*

A special relationship also did not exist between Johnson and Bjerke under section 324A(b). The concurrence concludes that a special relationship existed under section 324A(b) because "Johnson undertook a number of the duties normally owed by parents to their children," such as "provid[ing] Bjerke with room and board, as well as a level of guidance." Indeed, "[a] superficial reading of subsection (b) would lead one to believe that *any* endeavor to help another in the performance of its duty to protect a third person would lead direct-

---

**5.** The Sixth Circuits interpretation of section 324A(a) is compelled by the language of the provision:

> This must be so because the preliminary verbiage in Section 324A assumes negligence on the part of the defendant and further assumes that this negligence caused the plaintiffs injury. If we were to read subsection (a) as plaintiffs suggest, *i.e.,* that a duty exists where the negligence increased the risk over what it would have been had the defendant exercised due care, a duty would exist in every case. Such a reading would render subsections (b) and (c) surplusage and the apparent purpose of

all three subsections to limit application of the section would be illusory.

*Myers v. United States,* 17 F.3d 890, 903 (6th Cir.1994); *see also Patentas,* 687 F.2d at 716–17 (describing the language of section 324A(a) as assum[ing] that the injuries result in fact from the defendants negligent performance of his or her undertaking before it reaches the issue of increased risk); *Butler v. Advanced Drainage Sys., Inc.,* 282 Wis.2d 776, 698 N.W.2d 117, 126–27 (Ct.App.2005) (quoting the *Myers* court's interpretation of section 324A(a)), *aff'd on other grounds,* 294 Wis.2d 397, 717 N.W.2d 760 (2006).

ly to liability." *Plank v. Union Elec. Co.,* 899 S.W.2d 129, 131 (Mo.Ct.App.1995). But such an interpretation "was not intended by the drafters of the Second Restatement" and would "punish those who voluntarily assist others even where the third person was not made worse off by the volunteer acts," "discourage many benign acts of assistance," and "work a revolution in tort law." *Id.*

The comment and illustrations accompanying section 324A(b) suggest that a special relationship existed between Johnson and Bjerke under that provision only if, in addition to undertaking to protect Bjerke from third parties at Island Farm, Johnson also intended to *completely assume* this duty of protection that otherwise rested with Bjerke's parents. Comment d states that "a managing agent who takes charge of a building for the owner, and agrees with him to keep it in proper repair, assumes the responsibility of performing the owner's duty to others in that respect." Restatement (Second) of Torts § 324A cmt. d. Illustration 2 describes a negligent inspection by a person employed to inspect the employer's telephone poles, and illustration 3 describes a negligent inspection of work conditions by a person employed as superintendent of construction work. *Id.,* illus. 2–3. In each of these three scenarios, not only is the scope of the duty imposed limited by the scope of the undertaking, but the duty is completely assumed by the actor. *See Plank,* 899 S.W.2d at 131.

Other courts have recognized that a special relationship exists under section 324A(b) only when a duty is assumed in its entirety. In *Obenauer v. Liberty Mut. Ins. Co.,* the United States Court of Appeals for the Eighth Circuit affirmed the District Court of North Dakota's determination that there could be no section 324A liability where an insurance company's inspections "did not *replace*" a manufactur-

er's duty to "design a safe product." 908 F.2d 316, 317 (8th Cir.1990) (emphasis added). Likewise, the United States Court of Appeals for the Eleventh Circuit, applying Georgia law, ruled that for liability to be imposed under section 324A(b), a party "must completely assume a duty owed by [another] to [the third person]." *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1156 (11th Cir.1993); *see also Ricci v. Quality Bakers of Am. Coop. Inc.,* 556 F.Supp. 716, 721 (D.Del.1983) ("In order to prevail under section 324A(b), a plaintiff must establish that the one who undertook a duty to inspect supplanted and not merely supplemented another's duty to inspect."); *Heinrich v. Goodyear Tire Rubber Co.,* 532 F.Supp. 1348, 1355 (D.Md. 1982) ("Liability under section 324A(b) arises in the workplace setting only if the actor's undertaking was intended to be in lieu of, rather than as a supplement to, the employer's own duty of care to the employees."). Even if Johnson did undertake to protect Bjerke from third parties at Island Farm and assumed the duty to do so, her assumption of that duty was not absolute. There is no evidence that Bjerke's parents relinquished such a significant degree of authority over Bjerke.

### Section 324A(c)

Finally, a special relationship did not exist between Johnson and Bjerke under section 324A(c) because the harm Bjerke suffered was not caused by her reliance or the reliance of her parents on Johnson's undertaking. Reliance under section 324A(c) cannot be assumed. Rather, for liability to be imposed under section 324A(c), "there must be proof of actual reliance on a contractual undertaking or representations by the defendant that resulted in acts or omissions by the party relying on the defendant's undertaking." *Smith v. Universal Underwriters Ins. Co.,* 732 F.2d 129, 131 (11th Cir.1984) (quoting

*Trosclair v. Bechtel Corp.*, 653 F.2d 162, 165 (5th Cir.1981)) (emphasis omitted); *Deines,* 752 F.Supp. at 996. As noted by the Wisconsin Court of Appeals, "case law applying this subsection generally focuses on reliance in the form of altering the precautions that might otherwise have been taken without the defendant's undertaking." *Butler,* 698 N.W.2d at 129.

The record does not support the conclusion of the concurrence that Bjerke's "harm was suffered in some part because Bjerke's parents relied upon Johnson to look after their daughter." As explained earlier, it was understood that Bjerke was responsible for herself and that her parents had ultimate authority over her. The most telling indicator that Bjerke's parents did not rely on Johnson is the failure of Bjerke's mother to alert Johnson of her suspicion that Bjerke and Bohlman had an inappropriate relationship. If Bjerke's parents actually relied on Johnson to protect their daughter, Bjerke's mother would have certainly voiced her concerns to Johnson.

### III.

This is, in many respects, a difficult case. It is undisputed that abhorrent conduct occurred here, and the presence of such conduct undoubtedly triggers the desire to hold someone responsible. But difficult facts, a sympathetic victim, and even the sound public policy of protecting children from sexual abuse should not obscure the significant expansion of third party liability undertaken by the majority today.

I agree with the majority's conclusions that there are genuine issues of material fact as to whether Bohlman's sexual abuse of Bjerke was foreseeable and that primary assumption of risk does not apply in this case. But, because a special relationship did not exist between Johnson and Bjerke under either section 314A or section 324A, Johnson did not have a duty to protect Bjerke from Bohlman's sexual abuse. Therefore, I would hold that the district court properly granted partial summary judgment in Johnson's favor.

I respectfully dissent.

PAGE, J. (dissenting).

I join in the dissent of Justice G. Barry Anderson.

GILDEA, J. (dissenting).

I join in the dissent of Justice G. Barry Anderson.